UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA

VS.                          CRIMINAL NO. 3:15cr00067HTW-FKB-1

IRB BENJAMIN




ENTRY OF GUILTY PLEA



BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE
OCTOBER 18, 2016
JACKSON, MISSISSIPPI




APPEARANCES:

FOR THE GOVERNMENT:     MR. DARREN LAMARCA

FOR THE DEFENDANT:     MR. JOSEPH HOLLOMON


REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012
_____

501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186

1          THE COURT:  Good morning.

2          MR. HOLLOMON:  Good morning.

3          MR. LaMARCA:  Good morning.

4          THE COURT:  Please call your case.

5          MR. LaMARCA:  Yes, sir.  Your Honor, the matter before

6   the court is *United States v. Irb Benjamin*.  This is criminal

7   number 3:15cr67.  Mr. Benjamin is present with his attorney,

8   Joe Hollomon, Your Honor, and is present for a change of plea

9   as to Count 2 of the indictment.

10         THE COURT:  All right.  Good morning, Mr. Hollomon.

11         MR. HOLLOMON:  Good morning, Judge.  Good to see you.

12         THE COURT:  Good to see you.  You are with your

13   client, Mr. Benjamin?

14         MR. HOLLOMON:  Yes, sir.

15         THE COURT:  Good morning. Mr. Benjamin.  Mr. Hollomon,

16   how are we proceeding this morning?

17         MR. HOLLOMON:  Your Honor, we're prepared to go

18   forward on a change of plea to that of guilty to Count 2 of the

19   indictment pending against my client.

20         THE COURT:  All right.  Count 2?

21         MR. HOLLOMON:  Yes, Your Honor.

22         THE COURT:  All right.  Mr. Benjamin, is that correct

23   that you wish to enter a plea of guilty to Count 2?

24         THE DEFENDANT:  That's correct.

25         THE COURT:  I need to ask you a number of questions --

1          THE DEFENDANT:  All right, sir.

2          THE COURT:  -- which have to be answered truthfully so

3     then I'm going to have you sworn.  The court report will swear

4     you in.

5          (Defendant Sworn)

6          THE COURT:  Do you understand that you have been sworn

7     and if you give untruthful answers to any of my questions that

8     you could be prosecuted for perjury?

9          THE DEFENDANT:  Yes, sir.

10         THE COURT:  Do you know what perjury is?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  That's lying under oath.

13         THE DEFENDANT:  Right.

14         THE COURT:  Now, how old are you?

15         THE DEFENDANT:  I'm 70.

16         THE COURT:  How much schooling have you had?

17         THE DEFENDANT:  I've completed a master's degree.

18         THE COURT:  So then where did you go to high school?

19         THE DEFENDANT:  Went to high school in Rienzi

20    Mississippi, a degree from Mississippi State University.

21         THE COURT:  And your baccalaureate degree is from

22    Mississippi State?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  Your master's degree?

25         THE DEFENDANT:  Yes, sir.

1          THE COURT:  Your master's degree is in what area?

2          THE DEFENDANT:  Guidance and counseling.

3          THE COURT:  So you can read and write?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Have you taken any drugs of any type,

6 prescription drugs or nonprescription drugs, or consumed any

7 alcoholic beverages within the last 24 hours?

8          THE DEFENDANT:  I take only my prescription drugs for

9 the personal problems but none other.

10          THE COURT:  What kind of prescription drugs are you

11 taking?

12          THE DEFENDANT:  I take for -- for my heart, my blood

13 pressure, sugar, gout, prostate.

14          THE COURT:  All right.  And when you take these drugs,

15 how do they affect your ability to understand what is going on

16 around you?

17          THE DEFENDANT:  They do not.

18          THE COURT:  Okay.  When is the last time you've taken

19 any of those drugs?

20          THE DEFENDANT:  This morning.

21          THE COURT:  And right now, do you appreciate what's

22 going on here?

23          THE DEFENDANT:  Yes, sir, I certainly do.

24          THE COURT:  Do you appreciate the seriousness of this

25 hearing to your future?

1          THE DEFENDANT:  Yes, sir, I do.

2          THE COURT:  In order to enter a valid plea, what I was

3   just touching on, you must be mentally competent.  That means

4   that you are also able to consult with your attorney and to

5   understand his advice to you.  So under this definition of

6   competence, are you able to do all the things I have been

7   asking you about relative to competency?

8          THE DEFENDANT:  Yes, sir, I have.

9          THE COURT:  You also must have been competent on the

10  date that is charged in Count 2 of the indictment.  Count 2 of

11  the indictment alleges that on or about August 27, 2014, that

12  you committed the crime charged in Count 2.  Now, did you read

13  Count 2 of the indictment?

14         THE DEFENDANT:  Yes, sir, I did.

15         THE COURT:  Did you have a full understanding as to

16  what it says?

17         THE DEFENDANT:  Yes, sir, I do have.

18         THE COURT:  So then you know that it charges you under

19  Section 666(a)(2) and 2 of Title 18 United States Code?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  So back to the date.  The date is --

22  that's charged under Count 2 is on or about August 27, 2014.

23  I'm sure your attorney has advised you that when an indictment

24  charges on or about, that the prosecution does not have to

25  prove that the crime charged in Count 2 specifically occurred

1  on that specific date so long as the prosecution shows that the

2  crime occurred on a date reasonably near the data alleged, that

3  being August 27, 2014.  Do you understand that?

4        THE DEFENDANT:  Yes, sir, I do.

5        THE COURT:  So on or about August 27, 2014, did you

6  know the difference between right and wrong?

7        THE DEFENDANT:  Yes, sir, I did.

8        THE COURT:  Did you know that what is charged as a

9  crime in Count 2, in fact, was wrong?

10       THE DEFENDANT:  Yes, sir, I did.

11       THE COURT:  Now, I turn to you, Mr. Hollomon and I ask

12  do you raise any objections concerning your client's

13  competence?

14       MR. HOLLOMON:  None whatsoever, Your Honor.

15       THE COURT:  Does the prosecution?

16       MR. LaMARCA:  We do not, Your Honor.

17       THE COURT:  No one raises any objections concerning

18  the defendant's competence to know the difference between right

19  and wrong, to be able to consult with his attorney, to

20  understand the gravity of this matter or any other measures of

21  competency, whether befitting the crime itself or his general

22  state of mind.  Accordingly, this court finds the defendant

23  competent today to enter a plea of guilty.

24       Now, the law requires that you be adequately and

25  competency represented by your lawyer.  Have you had enough

time to discuss your case with your lawyer?

            THE DEFENDANT:  Yes, sir, I have.

            THE COURT:  Are you satisfied with his advice to you?

            THE DEFENDANT:  Yes, sir, I am.

            THE COURT:  If you have any complaints about the way
Mr. Hollomon has handled your case, you should advise me of
that at this time.  Do you understand that?

            THE DEFENDANT:  Yes, sir, but I have no concern.  I'm
well pleased.

            THE COURT:  No objections at all?

            THE DEFENDANT:  No objection.

            THE COURT:  All right.  I move now to your rights to a
trial.  Again, I am persuaded that Mr. Hollomon has probably
already discussed these rights to a trial with you.

            THE DEFENDANT:  Yes, sir, he has.

            THE COURT:  But I still have to put it on the record.
So I'm going to ask you some questions with regard -- not ask
you some questions.  I'm going to recite your rights and you
will tell me whether you understand them.  Okay?

            THE DEFENDANT:  Yes, sir.

            THE COURT:  If you have any questions about anything I
say, please do not hesitate to tell me so.

            Under the constitution and laws of the United States,
as a criminal defendant, you have certain rights, and I'm going
to go over them with you.  First of all, you are entitled to a

1    trial by jury if you want one.  I recognize you've stated that

2    you wish to enter a plea of guilty, but you can still change

3    your mind and ask for a jury trial or a bench trial and I will

4    provide a trial for you.  Do you understand that?

5              THE DEFENDANT:  Yes, sir, I do.

6              THE COURT:  Now, when I say that you are entitled to a

7    bench trial, I'm talking about two aspects of the criminal

8    justice system whereby the court provides a finder of fact and

9    a finder of law and a finder of a verdict in your case either

10   by a bench trial or by a jury trial.  Now, do you know what a

11   bench trial is?

12             THE DEFENDANT:  Yes, sir, I do.

13             THE COURT:  So a bench trial is where I will be the

14   judge of the law and I will be the judge of the facts.  There

15   will be no jury, and I will make all determinations in the case

16   including the verdict.

17             A jury trial, on the other hand, is where there will

18   be persons from the community and they will summonsed here and

19   they will make the determination on guilt or not guilt, and I

20   will be the judge of the law with regard to that whole

21   procedure.  Do you understand that?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  So since the matter concerning a bench

24   trial is fairly straightforward and doesn't require as much

25   explanation as would a bench trial -- as well as a jury trial,

I'll spend most of my time discussing a jury trial.  But keep
in mind that with regard to these functions that are merged
together as the judge of the law and judge of the facts and the
verdict are divided when we have a jury trial.  So you
understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  So then with regard to a jury trial, were
you to request a jury trial, persons from the community will be
summoned here at random and then after being summoned here
these prospective jurors will be questioned by all of the
parties, that is, by the prosecution, by the defense, and by
the court.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Those questions asked of them will require
answers under oath.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you further understand that during this
session that the principals can ask various questions designed
to touch upon the qualifications and the mindsets of the
prospective jurors to determine whether they should be seated
as regular jurors?  Do you understand that?

THE DEFENDANT:  Yes, sir, I do.

THE COURT:  And do you understand that during this
process that the prosecution will have a certain number of
strikes, that is, where the prosecution can excuse a certain

1  number of people from the jury panel based upon the rules, and

2  your attorney and you will also have a certain number of

3  strikes.  Do you understand that?

4  THE DEFENDANT:  Yes, sir.

5  THE COURT:  And do you further understand that the

6  number of strikes that you and your attorney will have will

7  actually out number the number of strikes that the prosecution

8  have -- the prosecution would have?  Do you understand that?

9  THE DEFENDANT:  Yes, sir.

10  THE COURT:  Do you further understand that after the

11  process is completed and after the parties have gone through a

12  procedure designed to whittle down the jury panel to the

13  correct size, that the court will end up with 12 jurors who

14  will be your jury in this case.  Do you understand that?

15  THE DEFENDANT:  Yes, sir.

16  THE COURT:  Do you further understand that the court

17  may place some alternate jurors on the panel, but they will

18  simply be alternates in case someone on the regular panel of 12

19  cannot continue.  Do you understand that too?

20  THE DEFENDANT:  Yes, sir.

21  THE COURT:  And do you further understand that after

22  that jury is impaneled, then that jury will be the triers of

23  fact?  Do you understand that?

24  THE DEFENDANT:  Yes, sir.

25  THE COURT:  And I will be the judge of the law.  My

1  job will be to maintain decorum in the courtroom, to rule on

2  objections and to rule on any legal matters that come before

3  the court.  Do you understand that?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Do you further understand that this

6  verdict that the jury may reach in the case would have to be

7  unanimous?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  That is, all 12 jurors would have to vote

10  the same way in order to find you guilty were you to ask for a

11  jury trial.  Do you understand that?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  So then the trial would begin.  So at top

14  of the trial and throughout the entire trial, you would be

15  presumed to be innocent.  Do you understand what that means?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  So that means that unlike the

18  jurisprudence in other countries, you would not come into the

19  courtroom presumed to be guilty.  Instead you would be presumed

20  to be innocent.  Now, this presumption of innocence has a

21  special meaning in our special form of the judiciary.  Because

22  you are presumed to be innocent and because this presumption of

23  innocence will clothe you throughout the trial until a jury

24  were to disagree and then find you guilty, but this presumption

25  of innocence will attend you throughout the entire trial.  And

1  because you would be presumed to be innocent, that means that

2  the prosecution here would be required to prove that you are

3  guilty.  Do you understand that?

4         THE DEFENDANT:  Yes, sir.

5         THE COURT:  So then you would not have to prove

6  anything.  You would not have to call any witnesses.  You would

7  not have to provide any exhibits.  You would not even have to

8  testify.  Do you understand that?

9         THE DEFENDANT:  Yes, sir.

10         THE COURT:  So then the prosecution would have the

11  burden to prove that you are guilty and the prosecution will be

12  laboring under a specific standard of proof, a particular

13  standard of proof that's evidenced in criminal trials, and that

14  standard of proof is proof beyond a reasonable doubt.  Have you

15  heard that standard of proof before?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  And by that standard of proof, in order

18  for a jury to convict you, the jury must be persuaded that it

19  would have or has no reasonable doubt concerning your guilt.

20  Do you understand that?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  So then that's the standard of proof.

23  Now, if the jury is so persuaded, then the jury will vote

24  guilty.  As I said before, that verdict must be unanimous.  Do

25  you understand that too?

1          THE DEFENDANT:  Yes, sir, I do.

2          THE COURT:  If the jury is not persuaded and all 12

3     are not persuaded, then the jury's verdict would be not guilty.

4     Do you understand that?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  And if there's a split in the vote, where

7     some say guilty and others say not guilty and jury ends up in a

8     deadlock, then that consequence results in what is called a

9     mistrial, a hung jury.  Do you understand that?

10         THE DEFENDANT:  Yes, sir.

11         THE COURT:  Then the prosecution upon that occurrence

12    would have to decide whether to try this case again with a new

13    jury.  Do you understand that?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  And if the prosecution elects not to try

16    it again, then this case would go away.  On the other hand, if

17    the prosecution elects to try it again, then the parties will

18    congregate in court before a new jury and start the process all

19    over again.  Do you understand that?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  So then with regard to this evidence that

22    I've been talking about, the prosecution has to prove your

23    guilt by proof beyond a reasonable doubt.  To do so, the

24    prosecution would have to produce competent evidence.  Evidence

25    can be in the form of witnesses testimony, that is, witnesses

sworn to tell the truth.  Competent evidence could be in the form of exhibits admitted into the record as exhibits. Competent evidence could be stipulations between your side and the prosecution whereby both sides say that certain facts would not be disputed during the course of the trial because both sides agree with those particular facts.  Do you understand all of that?

THE DEFENDANT:  Yes, sir.

THE COURT:  So then you understand that the prosecution would be under the burden to produce evidence showing that you are guilty, that is, evidence admitted into the record by the judge.  So I would have to agree that the evidence is competent.

Now, in order for me to make a determination whether it is competent, I would rely upon the court's own view of the rules.  I would also rely upon any objections that might be made by the various parties here.  So if your side were to object to some evidence, then I would review that evidence and make a ruling under the rules of evidence to determine whether a jury should hear that evidence.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And similarly, if the prosecution were to make an objection, I would also review the objection and then determine whether under the rules that evidence should or should not be considered by the jury.  Do you understand all of

that?

THE DEFENDANT:  Yes, sir, I do.

THE COURT:  So you have any questions so far on anything that I've stated?

THE DEFENDANT:  No, sir, I do not have any questions.

THE COURT:  All right.  Now, let's go back to this matter of evidence again from your side.  I said that you could call witnesses, and if you want to call witnesses you'll fill out a form call a subpoena to get these witnesses here, and that's a formal document that requires a witness to show up. If the witness is not here, then the Marshal Service will obtain the witness.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Exhibits.  You have a right to submit exhibits if you wish do so.  And if you wish to submit exhibits, then you prepare them and see if the prosecution objects to your exhibits.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  The prosecution would have a similar opportunity to call witnesses to get them here by subpoena and to produce exhibits and to see whether those exhibits will earn your objection.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Now, you can also testify if you wish. Now, the prosecution cannot call you to the witness stand and

make you testify.  You have a right under the Fifth Amendment

to the United States Constitution to refuse to testify.

Neither the government, your counsel, no the court can make you

testify when such would violate the Fifth Amendment to the

United States Constitution.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  So you have that unfettered right to say,

"I do not wish to testify."  Now, I will take up your

determination outside the presence of the jury.  I would not

make you stand up in front of the jury and proclaim this

assertion.  Instead, I will take this up outside the presence

of the jury.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  But if you decide not to testify, I will

advise the jury that the defendant has elected not to testify,

which is his constitutional right under the Fifth Amendment to

the United States Constitution.  And you, the jury, can draw no

adverse inference whatsoever from his election not to testify.

You cannot even discuss that matter in the jury room.  Do you

understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Similarly with regard to this matter of

other evidence, if you elect not to call any witnesses or you

elect not to produce any evidence at all, then again I will

advise the jury that that is your right and they cannot hold

1   that against you, but instead the jury at all times is to be

2   focused on whether the prosecution has proved its case against

3   you, not on whether you submitted evidence, not on whether you

4   testified, but whether the government's evidence is sufficient

5   to persuade the jury that you are guilty by proof beyond a

6   reasonable doubt.  Do you understand that?

7           THE DEFENDANT:  Yes, sir.

8           THE COURT:  Now, if you were to elect to go to trial

9   and if you were to elect to testify, I will also give the jury

10   a specific instruction on that matter.  I will tell the jury

11   that the jury is not to disbelieve your testimony simply

12   because you are the defendant.  Instead, the jury should

13   evaluate your testimony under the same test, under the same

14   calculus, under the same examination mode that the jury

15   evaluates other witnesses' testimony.  Do you understand that?

16           THE DEFENDANT:  Yes, sir.

17           THE COURT:  Do you have any questions thus far on any

18   of this?

19           THE DEFENDANT:  No, sir.  I understand what you said.

20           THE COURT:  Now, if you elect to plead guilty, that is

21   you say, "I am guilty and I'm pleading guilty to Count 2" and

22   then you discuss that matter with me and during that discussion

23   you admit that you are guilty as charged, do you understand

24   that you will be giving up your Fifth Amendment rights?

25           THE DEFENDANT:  Yes, sir.

1    THE COURT:  Now, do you still wish to enter a plea of

2 guilty to Count 2 of the indictment?

3    THE DEFENDANT:  Yes, sir.

4    THE COURT:  So now let's look at Count 2.  First of

5 all, did you read this entire indictment?

6    THE DEFENDANT:  Yes, sir, I did.

7    THE COURT:  And did you discuss this whole matter with

8 your lawyer?  Did you discuss all of it with your lawyer?

9    THE DEFENDANT:  Yes, sir.

10    THE COURT:  Do you have any questions about what is

11 charged in Count 1?

12    THE DEFENDANT:  No, sir.

13    THE COURT:  Do you have any questions about what is

14 charged in Count 2?

15    THE DEFENDANT:  No, sir.

16    THE COURT:  Let's talk about Count 2.  Do you have a

17 copy of the indictment there in front of you?

18    MR. HOLLOMON:  We do, Your Honor.

19    THE COURT:  Count 2 reads as follows:  The allegations

20 contained in paragraphs 1 through 19 of this indictment are

21 realleged and incorporated herein by reference as though fully

22 set forth herein.  That's why I asked you whether you had read

23 the entire indictment because Count 2 begins by referring to

24 Count 1.  Now, so did you read the entire indictment?

25    THE DEFENDANT:  Yes, sir, I did.

THE COURT:  Now let's continue reading.  That was at paragraph 20.  At paragraph 21, it alleges on or about August 27, 2014, in Hinds County in the Northern Division of the Southern District of Mississippi and elsewhere the defendant, Irb Benjamin, did knowingly and corruptly give, offer, or agree to give something of value to Christopher B. Epps with intent to influence or reward Christopher B. Epps in connection with the business transaction or series of transactions of the Mississippi Department of Corrections involving something of value of $5,000 or more, that is, the awarding and the retention of contracts to Benjamin and MCM for alcohol and drug treatment services at MDOC facilities in Alcorn and Simpson Counties, all in violation of sections 666(a)(2) and 2 of Title 18, United States Code.

Now, did you read along with me on that?

THE DEFENDANT:  Yes, sir, I did.

THE COURT:  And previously you have read this, and you understand it?

THE DEFENDANT:  Yes, sir.

THE COURT:  So you're telling me then that with regard to Count 2 that you have read Count 1 and appreciate what the government alleges in Count 1 which would give some substance to some of the matters alluded to in Count 2.

THE DEFENDANT:  Yes, sir.

1          THE COURT:  For instance, it speaks in the fourth line

2    from the top of the page of the Mississippi Department of

3    Corrections.  So then you know that this matter of this

4    indictment, Counts 1 and 2, allegedly involves Christopher Epps

5    of the Mississippi Department of Corrections.  Do you

6    understand that?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  This indictment also says that this

9    matter -- excuse me, that the Mississippi Department of

10   Corrections receives certain federal funds and this matter

11   concerns something of value of $5,000 or more.  Do you

12   understand that?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  This next phrase, the awarding and the

15   retention of contracts to Benjamin and MCM.  Now, this is

16   referred to in Count 1 which addresses the awarding and

17   retention of contracts, and it's more particularly described in

18   Count 1, the government's accusation about contracts awarded

19   you and your business and the retention of same, and even your

20   appointment as a consultant at some point to some business with

21   the interaction and influence of Christopher B. Epps.  Did you

22   read all of that?

23         THE DEFENDANT:  Yes, sir, I did read all that.

24         THE COURT:  Did you further read that your business

25   dealt in alcohol and drug treatment services at MDOC

1   facilities?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  And, further, that this reference to

4   facilities in Alcorn and Simpson Counties is also more

5   particularly described in Count 1, and also there's a reference

6   in Count 1 as to what approval the construction of the

7   facilities in those areas and the other matters pertaining to

8   those facilities had to go through the governance of various

9   counties associated with these businesses.

10         For instance, over in paragraph 18 of Count 1, it

11   mentioned again facilities in Alcorn and Simpson Counties, and

12   there's some other references in Count 1.  But my question

13   again is did you read all of that, not only in Count 1 but also

14   in the preamble to Count 1, because in the preamble to Count 1,

15   for instance, at paragraph 2, MCM Mississippi Correctional

16   Management is described, that is, it was under contract with

17   the state of Mississippi to provide alcohol and drug treatment

18   services to inmates at Mississippi Department of Corrections.

19         And then it spoke about -- then paragraph 2 mentions

20   Alcorn County and Simpson County and then in paragraph 4 it

21   speaks about Alcorn, Washington, and Chickasaw Counties

22   relative to consulting services and such had to meet American

23   Correctional Association Accreditation standards during the

24   construction of the respective facilities and to ensure that

25   each facility maintained the accreditation during their

1  subsequent operations.

2         Do you see all of that?

3         THE DEFENDANT:  Yes, sir.

4         THE COURT:  And did you see the amounts of monies that

5  are described there that were received by MCM?  Did you see

6  that?

7         THE DEFENDANT:  Yes, sir, I did.

8         THE COURT:  That preamble in paragraph 5 indicates the

9  amount of money that MCM was paid as a result of its contract

10 with Alcorn County.  Similarly paragraph 6, 7, also maintained

11 that amounts were paid to MCM as a result of his contract with

12 Washington County and Chickasaw County.

13        And then paragraph 8 alleges that you were the owner

14 of MCM, and then there's some other assertions whereby it

15 states in paragraph 10 that you were employed by CGL as a

16 consultant, and then -- it mentioned CGL in paragraph 9, which

17 stands for Global -- stands for Carter Global Lee Facility

18 Management, that it too was under contract with MDOC to provide

19 maintenance services to MDOC Regional Correctional Facility.

20 Do you see all of that?

21        THE DEFENDANT:  Yes, sir.

22        THE COURT:  And further in paragraph 11, it says that

23 the total value of the contract between the state of

24 Mississippi and CGL for maintenance services was $4,800,000.

25 Do you see that?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And that Christopher B. Epps was the

3    commissioner of the Mississippi Department of Corrections.  Did

4    you see all of that in the preamble --

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  -- before Count 1?

7          THE DEFENDANT:  Right.

8          THE COURT:  And did you understand all of that?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  And you understand what the allegations of

11   Count 2 are?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  Do you have any questions whatsoever?

14          THE DEFENDANT:  None, no, sir.

15          THE COURT:  Let me turn to the prosecution.  Do you

16   intend to seek any criminal forfeiture here?

17          MR. LaMARCA:  We do, Your Honor.

18          THE COURT:  Okay.  Thank you.  Now, let me go back to

19   the defendant.  Do you look at -- can you look at paragraph 24

20   of the indictment?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  Do you see the styling "Notice of Intent

23   To Seek Criminal Forfeiture"?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  And do you understand that the prosecution

1   by this assertion in the indictment intends to seek forfeitures

2   against you against all property involved in or traceable to

3   property involved in the offense including but not limited to

4   all proceeds obtained directly or indirectly from the offense

5   and all property used to facilitate the offense?  Do you

6   understand that?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  And do you further understand that the

9   prosecution by this provision indicates that it would seek to

10  locate any such property by legal means and then to bring that

11  property before the court for adjudication?  Do you understand

12  that too?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  And do you understand that the prosecution

15  is bringing this forfeiture provision pursuant to

16  Section 981(a)(1)(A) and (C) Title 18 United States Code and

17  Section 2461, Title 28 United States Code.  Do you understand

18  all of that?

19         THE DEFENDANT:  Yes, sir, I do.

20         THE COURT:  Do you have any questions at all about

21  what the charge is against you?

22         THE DEFENDANT:  No, sir.

23         THE COURT:  Now, will the prosecution discuss the

24  elements that the prosecution is required to prove if this case

25  were to go to trial?  And, Mr. Benjamin, you may have a seat,

1    and I'll have you stand up in just a moment.  But for the time

2    being, why don't you all have a seat.  Mr. Benjamin, did I

3    notice a slight limp on your part?

4              THE DEFENDANT:  Yes, I've got a little gout problem.

5              THE COURT:  Which leg?

6              THE DEFENDANT:  Both of them.

7              THE COURT:  Are you experiencing some problems right

8    now with your gout?

9              THE DEFENDANT:  No, sir, just routine soreness.

10             THE COURT:  Okay.  Now, from time to time I have been

11   a victim of that same culprit.  So I know how vicious it can

12   be.  Those who have not had an attack are fortunate, but my

13   last one was about a year and a half ago.  So are you taking

14   care to reduce the possibility of attacks?

15             THE DEFENDANT:  Yes.  I take medication for it,

16   Allopurinol.

17             THE COURT:  Okay.  But I notice you were limping when

18   you went back to your seat.

19             THE DEFENDANT:  That, and arthritis in my leg.  I can

20   hardly stand at times.

21             THE COURT:  I'm going to make some accommodations for

22   you in that respect.  So don't move until I tell you to.  All

23   right?

24             THE DEFENDANT:  Thank you.

25             MR. HOLLOMON:  Thank you, Your Honor.

1          THE COURT:  All right.  Now, then, Counsel, will you

2    provide for me the elements that the prosecution would have to

3    prove by proof beyond a reasonable doubt, and these elements

4    must be proven each one by proof beyond a reasonable doubt.

5          Now, then, read off the elements and take your time in

6    reading those elements.  And why don't you go to the podium so

7    that the court reporter will not have any problems in picking

8    up your voice.

9          MR. LaMARCA:  Yes, Your Honor.

10          THE COURT:  Go ahead.

11          MR. LaMARCA:  Thank you, Your Honor.  Title I United

12    States Code Section 666(a)(2) makes it a crime for anyone to

13    corruptly give, offer, or agree to give anything of value to

14    any person with intent to influence or reward an agent of an

15    organization or of a state, local, or Indian tribal government

16    or any agency thereof that receives more than $10,000 in

17    federal assistance in any one-year period in connection with

18    any business, transaction, or series of transactions of such

19    organization, government, or agency involving anything of value

20    of $5,000 or more.

21          A jury would have to be convinced that the government

22    has proved each of the following elements beyond a reasonable

23    doubt:

24          First, that Christopher Epps was an agent of the State

25    of Mississippi as the commissioner of the Mississippi

Department of Corrections.

Secondly, that the Mississippi Department of Corrections was a state government agency that received in any one-year period benefits in excess of $10,000 under a federal program involving a grant.

Third, that the defendant corruptly gave and agreed to give cash, being a thing of value, to any person with the intent to influence and reward Christopher Epps in connection with any business of the Mississippi Department of Corrections.

And, fourth, that the business involved anything of value of $5,000 or more.

The term "agent" means a person authorized to act on behalf of another person or a government and in the case of an organization or government, includes a servant or employee and a partner, director, officer, manager, and representative.

The term "government agency" means a subdivision of the executive, legislative, judicial, or other branch of government including a department, independent establishment, commission, administration, authority, board, and bureau and a corporation or other legal entity established and subject to control by a government or governments for the execution of a governmental or intergovernmental program.

The term "local" means of or pertaining to a political subdivision within a state. And the term "state" includes a state of the United States, the District of Columbia, any

1 commonwealth, territory, or possession of the United States.

2 The term "in any one-year period" means a continuous
3 period that commences no earlier than 12 months before the
4 commission of the offense or that ends no later than 12 months
5 after the commission of the offense. Such period may include
6 time both before and after the offense.

7 An act is corruptly done if it is done intentionally
8 and with an unlawful purpose.

9 The word "value" means the face, par, and market value
10 or cost price, either wholesale or retail, whichever is
11 greater.

12 And finally, it's not necessary to prove that the
13 defendant's conduct directly affected the federal funds
14 received by the agency under the federal program; however,
15 there must be some connection between the criminal conduct and
16 the organization or agency thereof receiving the federal
17 assistance.

18 Finally, a jury would be instructed that in
19 determining whether the defendant is guilty of the offense,
20 they are not to consider bona fide salary, wages, fees, or
21 other compensation paid or expenses paid or reimbursed in the
22 usual course of business.

23 That would be the recitation of the elements as they
24 pertain to Count 2 as well as the necessary definitions, Your
25 Honor.

1          THE COURT:  And then to emphasize here the scienter

2     requirement, the state of mind requirement, that this defendant

3     must have had in order to commit that crime, that scienter

4     requirement is what?

5          MR. LaMARCA:  That it is done corruptly, meaning

6     intentionally and with an unlawful purpose.

7          THE COURT:  All right.  I just wanted to be sure that

8     we went back over that again, that it is not an innocent act,

9     not an act done out of mistake but an act done knowing that it

10    is against the law.

11         MR. LaMARCA:  That is correct, yes, Your Honor.

12         THE COURT:  Now, then, also will you please describe

13    the maximum punishment that the court can impose.

14         MR. LaMARCA:  One second, if I may.  Your Honor, the

15    maximum punishment for Count 2 is not more than ten years of a

16    term of imprisonment and up to -- or up to a $250,000 fine.

17    Also supervised release --

18         THE COURT:  Excuse me.  You said "or."  It's "and."

19         MR. LaMARCA:  And.  And.  Yes, Your Honor.

20         THE COURT:  So it's 10-year imprisonment and a fine up

21    to the amount that he just mentioned.

22         MR. LaMARCA:  That's correct.

23         THE COURT:  Continue.

24         MR. LaMARCA:  Thank you.  And in addition, supervised

25    release of not more than three years and a special assessment

1  that would be imposed of $100.

2          THE COURT:  All right.  Thank you.

3          MR. LaMARCA:  Yes, sir.  Anything further, Your Honor?

4          THE COURT:  Just say what the proof burden is on the

5  matter of forfeiture.

6          MR. LaMARCA:  The matter of forfeiture, Your Honor,

7  would be proof by a preponderance of the evidence as to those

8  matters that are set out in the notice of forfeiture.

9          THE COURT:  Thank you.

10          MR. LaMARCA:  Yes, sir.

11          THE COURT:  The defendant can remain seated, and since

12  you might need the advice of your counsel, he can also remain

13  seated so you all can sit right next to each other.

14          Now, several things.  First of all, do you understand

15  what the prosecution would have to prove if your case went to

16  trial?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Do you understand that he would have to

19  prove each and every element beyond a reasonable doubt?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  That if the prosecution fails to prove any

22  specific element that then the prosecution would lose in its

23  bid to persuade a jury that you are guilty.  Do you understand

24  that?

25          THE DEFENDANT:  Yes, sir.

1          THE COURT:  So then this indictment if you still have

2     a copy of it -- you do have a copy still?  Thank you,

3     Mr. Hollomon.  Now, you have a copy of that indictment again in

4     front of you?

5          MR. HOLLOMON:  We do, Your Honor.

6          THE COURT:  It gives the date of on or about

7     August 27, 2014.  It mentions the venue, that is, Hinds County,

8     Mississippi, and the Northern Division of the Southern District

9     of Mississippi, which refers to this court, that you did

10    knowingly and corruptly give, offer, or agree to give something

11    of value.

12         Look at that term "knowingly."  That means that you

13    committed an act understanding what you were doing, not because

14    of mistake, that you were aware of what you were doing.

15         The next word there that I wish you to pay special

16    attention to is "corruptly."  Corruptly we discussed, which

17    means you were acting in a manner which violated the law, and

18    you knew that you were violating the law.  Do you understand

19    all of that?

20         THE DEFENDANT:  Yes, sir, I do.

21         THE COURT:  Then it says that you did "knowingly and

22    corruptly give, offer, or agree to give something of value."

23    Now, this word "value" has an embracive meaning.  It means --

24    that's embracing not abrasive, Cherie -- embracive meaning that

25    is it incorporates all type of items which carry value, that

1    is, which carry some prospect of increasing one's financial

2    worth or something that increases one's property worth or

3    anything which is given to result in a higher amount of ever

4    what that is, par, or any other type of description that would

5    equate to value than it already has.  Do you understand that?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  The person here is Christopher B. Epps,

8    that allegedly you did give, offer, or agree to give something

9    of value to Christopher B. Epps, and Christopher B. Epps was a

10   commissioner of the institution that we're talking about.  Do

11   you understand that?

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  And then notice it says, "with intent to

14   influence or reward Christopher B. Epps."  With intent to

15   influence or reward.  Now, all of this is preceded by that

16   modifier of knowingly and corruptly give, offer, or agree to

17   give.  Do you understand what?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  So that's the state of mind.  "In

20   connection with the business or transaction or series of

21   transactions with the Mississippi Department of Corrections

22   involving something of value $5,000 or more."  So then the

23   indictment alleges that matter -- that the something of value

24   is money.  Do you understand that?

25             THE DEFENDANT:  Yes, sir.

1          THE COURT:  That is $5,000 or more.  And then it
2    states in connection -- the connection of this whole matter as
3    being the awarding and retention of contracts to you and MCM.
4    You see that?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  "Which provided alcohol and drug treatment
7    services at MDOC facilities in Alcorn and Simpson Counties."
8    Do you see all of that?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  Any questions about anything concerning
11    what the prosecution has to prove?

12          THE DEFENDANT:  No, sir.

13          THE COURT:  And in regard to the criminal forfeiture
14    provision, any questions about what the prosecution has to
15    prove there?

16          THE DEFENDANT:  No, sir.

17          THE COURT:  Now, notice that with regard to this
18    charge in Count 2, the government's burden is proof beyond a
19    reasonable doubt.  On this matter of forfeiture, the
20    government's burden is preponderance of the evidence.

21          Now, they are two different proof burdens.  Usually
22    preponderance of the evidence -- well, not usually but
23    preponderance of the evidence only pertains to civil cases.
24    Proof beyond a reasonable doubt is a proof burden that pertains
25    to criminal cases.  So while your charge under Count 2 has to

1    be obedient to the criminal standard of proof beyond a

2    reasonable doubt, this standard on forfeiture -- this standard

3    on forfeiture has to be obedience to the civil standard of

4    preponderance of the evidence.

5         Let me explain to you what preponderance of the

6    evidence is.  Ordinarily in a civil trial where a plaintiff

7    sues a defendant asking for some sort of relief, the standard

8    in the civil case is generally a preponderance of the evidence.

9    That means that in order to win, the plaintiff bringing the

10   lawsuit must prove to the jury that the plaintiff is entitled

11   to a verdict, and I will instruct the jury that the plaintiff

12   wins only if the plaintiff shows that the evidence favoring the

13   plaintiff's case is by a preponderance of the evidence, that

14   is, that the evidence favoring the plaintiff weighed against,

15   compared against, contrasted to the defendant's favorable

16   evidence outweighs the defendant's evidence.

17        Now, this balancing test doesn't require the plaintiff

18   to prove that the evidence favoring the plaintiff is double the

19   favorableness of the defendant's case or three times greater or

20   two times greater.  Instead, the court employs a very simple

21   balancing test illustration and that is to hold up the court's

22   hands and to say plaintiff's side is here to the left,

23   defendant's side is to the right.  For plaintiff to win,

24   plaintiff would have to make the scales tip ever so much in the

25   plaintiff's side.  It does not require the evidence to be

1    overwhelming in favor of plaintiff as to go all the way down.

2    Instead, the plaintiff on preponderance of the evidence wins if

3    the scales tip ever so slightly in plaintiff's favor, ever so

4    slightly.

5            Some counsel when they appear before a jury in a civil

6    case, they tell the jury that the proof for them must be

7    51 percent as opposed to 48 percent for the defense.  But that

8    is not entirely accurate because if you start off with both

9    sides as 50 percent, in order for plaintiff to win, plaintiff

10   simply has to make the scales tip just a little bit in

11   plaintiff's side.  So it might be less than 51 percent but it's

12   greater than 50 percent.  Do you understand what I'm saying?

13           THE DEFENDANT:  Yes, sir.

14           THE COURT:  So that's preponderance of the evidence,

15   and that's the standard that will govern this forfeiture

16   provision contrary to that standard of proof beyond a

17   reasonable doubt which governs criminal matters.  So do you

18   understand the difference?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  Any questions about any of this?

21           THE DEFENDANT:  No, sir.

22           THE COURT:  What about this matter concerning the

23   maximum sentence the court can impose?  Do you have any

24   questions about that?

25           THE DEFENDANT:  No, sir.

1          THE COURT:  Now, you have offered to plead guilty to

2    Count 1 -- excuse me, Count 2.  And you know what the maximum

3    possible sentence is regarding Count 2?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Now, I will have to determine what that

6    appropriate sentence is.  And your attorney and you have

7    probably discussed the sentencing guidelines.

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Okay.  And you also understand what the

10   maximum sentence is under the statute.  Do you understand?

11         THE DEFENDANT:  Correct.

12         THE COURT:  And you understand that ordinarily,

13   ordinarily the sentencing guidelines provide a sentence less

14   than the maximum carried by the statute.  Do you understand

15   that?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  But now I need to advise you of this.

18   This court has the prerogative at sentencing whether to

19   sentence you under the statute or whether to sentence you under

20   the guidelines.  That's the prerogative of the court.  I will

21   not be bound by any recommendation by any party here, not by

22   the prosecution, not by the defense as to whether to sentence

23   you under the guideline or under the statute.  Do you

24   understand that?

25         THE DEFENDANT:  Yes, sir.

1      THE COURT:  So under the statute, you know what the

2  maximum sentence is.  So under the statute, I can sentence you

3  from the minimum under statute, which is, well, one day up to

4  the maximum, which is what the prosecution has determined.  Do

5  you understand that?

6      THE DEFENDANT:  Yes, sir.

7      THE COURT:  In fact, that minimum might be less than

8  one day, could probably be a half a day or I don't have to

9  sentence you to any term of imprisonment at all.  Do you

10  understand that, under the statute?

11      THE DEFENDANT:  Yes, sir.

12      THE COURT:  So the court has that leeway under the

13  statute.  Under the guidelines, I will be provided a guideline

14  range by the parties where each will do its calculations as to

15  what the minimum sentence is and maximum sentence is under the

16  guidelines.  And that guideline has a range from the minimum

17  sentence to the maximum sentence.  Do you understand all of

18  that?

19      THE DEFENDANT:  Yes, sir.

20      THE COURT:  And do you further understand that with

21  regard to any sentence this court imposes, that the federal

22  courts no longer have parole?  Do you understand that too?

23      THE DEFENDANT:  Yes, sir.

24      THE COURT:  Now, let's look at this distinction

25  between the statute and the guidelines.  I've told you already

1    that under the guidelines I can go essentially to -- from zero

2    imprisonment unless this is some mandatory matter that requires

3    a minimum confinement time, but I could go from zero up to the

4    maximum sentence, and I also can go from zero up to the maximum

5    fine.  Do you understand that?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  And I can sentence you under both the

8    incarceration provision and the fine provision.  Do you

9    understand that?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Under the guidelines matter, as I was

12   explaining to you, the court will look at the guidelines

13   computations, and I look at the basic numbers involving the

14   offense.  I will look at whether there's any aggravation of

15   these matters that would add more points.  I will look at are

16   there any matters which mitigate these points, that is, your

17   decision to plead guilty, and any other points in mitigation

18   that are lawfully to be adduced.  Do you understand that?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  I will also look at your criminal history

21   score and then I will take your final computation score

22   relative to the offense and the mitigation and aggravation

23   features, and I will compare that with the criminal history

24   score and go to a table of punishment.  And then when I consult

25   the table of punishment, I will expect to find the minimum

1  sentence for that particular matter as well as the maximum.  Do

2  you understand that?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Now, this court can upward depart other

5  downward depart.  Let's talk about, first of all, downward

6  departure.  Suppose I have a guideline range of 2 to 4.  Just 2

7  to 4.  I'm just throwing it out.  2 being the downward -- 2

8  being the lowest of the sentencing guidelines range.  I can go

9  below 2 if I find certain mitigating matters that have not been

10 contemplated by the writers of the sentencing guidelines.  Do

11 you understand that?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  If I were to choose to do that, I would

14 have to explain on the record why I have done that.  Do you

15 understand that?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Similarly, I can with regard to the upper

18 range decide to go higher than the upper range if I am

19 persuaded that there are some matters I should consider and

20 that those matters carry additional points and then I can go

21 beyond the upper range of the sentencing guidelines.  Do you

22 understand that?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  There's something called relevant conduct,

25 relevant conduct.  That term alludes or refers to matters that

1  the court can take into account with regard to your activities

2  that should be read along with the charge of conviction.  So I

3  have read to you Count 2, and you have read it yourself.

4  Relevant conduct can be conduct which is not specifically

5  charged in Count 2 because those matters specifically charged

6  in Count 2 should be picked up under the regular sentencing

7  guidelines.  But if there's some matters on the outside of

8  Count 2 that are so closely related to the ongoing activities

9  of Count 2, the court can take that into account and then

10  determine to increase the sentencing guidelines to a higher

11  level.  Do you understand that?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  So in Count 1, you have been charged with

14  a crime.  You are not pleading guilty to Count 1, but the

15  allegations of Count 1 might not completely disappear.  Some of

16  those allegations might surface in relevant conduct.  Do you

17  understand that?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  If those allegations surface as part of

20  relevant conduct, your lawyer would be on notice of this and

21  you too by way of the presentence investigation report and by

22  the declarations of the prosecution.  And if you have

23  objections to the court increasing your exposure under the

24  sentencing guidelines because of relevant conduct, then you

25  would have a right through your lawyer to make appropriate

objections.  Do you understand that?

          THE DEFENDANT:  Yes, sir.

          THE COURT:  So in this vein, you should understand
that while you may have looked only at Count 2 and only as to
how you and your counsel read the rules, the sentencing
guidelines as affecting Count 2, Count 2's sentencing guideline
provision could be enlarged by relevant conduct.  Do you
understand that?

          THE DEFENDANT:  Yes, sir.

          THE COURT:  So then it would behoove you and your
attorney to make specific inquiry to the prosecution whether
the prosecution intends to allege relevant conduct.  In
addition, you should make inquiry to the probation officer as
to whether the probation officer will include a request or
recommendation for relevant conduct to be considered.  Do you
understand that?

          THE DEFENDANT:  Yes, sir.

          THE COURT:  Any questions about any of that?

          THE DEFENDANT:  No, sir.

          THE COURT:  Now did you hear this matter about
supervised release?

          THE DEFENDANT:  I think so, Your Honor.

          THE COURT:  Well, let me repeat it again.
Mr. LaMarca, how much -- how much of a term of supervised
release can this court impose?

1          MR. LaMARCA:  Up to three years.

2          THE COURT:  All right.  You understand?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  All right.  Now, supervised release, if

5    the court orders supervised release, either before -- either in

6    the absence of incarceration or as a part of the sentence

7    involving incarceration, supervised release takes effect when

8    the court places you under the jurisdiction of the United

9    States Probation Office where the probation office is required

10   to monitor you to determine whether you are obeying the

11   restrictions, the behavior modes that the court has imposed

12   upon you and that if you violate any of those, then you could

13   be brought back to court and then the court can impose

14   additional discipline.  Do you understand that?

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  Do you understand that you may have to

17   report to probation on a regular basis?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  And comply with the restrictions or

20   conditions imposed upon you by the court?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  And if you violate any of such, that you

23   could stand to be resentenced?  Do you understand that?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  Any questions about this matter

punishment?

THE DEFENDANT:  No, sir.

THE COURT:  Any question of this matter that the government has to prove?

THE DEFENDANT:  No, sir.

THE COURT:  And you recognize you have to pay the $100 special assessment fee?

THE DEFENDANT:  Yes, sir.

THE COURT:  Now, has anyone threatened you or forced you to come here today to enter a plea of guilty?

THE DEFENDANT:  No, sir.

THE COURT:  Are you pleading guilty voluntarily of your own free will?

THE DEFENDANT:  Yes, sir, I am.

THE COURT:  Let me turn to the prosecution.  Is there a plea agreement?

MR. HOLLOMON:  There is, Your Honor.

THE COURT:  Please discuss the plea agreement.

MR. LaMARCA:  Your Honor, the defendant has agreed to plead guilty to Count 2 of the indictment.  The government will make those recommendations as contained within the plea supplement.  In addition, as part of the agreement, the defendant will and has agreed to waive certain rights and those rights -- with the exception of ineffective assistance of counsel, the rights that he has agreed to waive are the rights

1  to appeal the conviction and sentence or the manner in which

2  the sentence is imposed on any ground whatsoever, the right to

3  contest the conviction and sentence or the manner in which the

4  sentence is imposed in any postconviction proceeding, including

5  one under 28 USC Section 2255.

6        In addition, the defendant is waiving any right to

7  seek attorneys fees or costs as well as any right, whether

8  asserted directly or through a representative, to request or

9  receive records about the case under the Freedom of Information

10  Act or the Privacy Act.

11        The government would request that the court during

12  this hearing specifically address the defendant as pertains to

13  these waivers that he will be entering pursuant to this plea

14  agreement.

15        THE COURT:  All right.  And the plea supplement in

16  addition?

17        MR. LaMARCA:  Yes, Your Honor.  The plea supplement,

18  of course, would be filed under seal with the court, the

19  agreement being filed in the normal course of business.

20        THE COURT:  All right.  Thank you.  All right,

21  Mr. Benjamin, do you have a plea agreement with the government?

22        THE DEFENDANT:  Yes, sir, I do.

23        THE COURT:  And has that agreement been reduced to

24  writing?

25        THE DEFENDANT:  Yes, sir.

1          THE COURT:  Is that writing now before the court?

2          THE DEFENDANT:  Yes.  It's my understanding that it

3    is, yes, sir.

4          THE COURT:  Did you read it?

5          THE DEFENDANT:  Yes, sir, I did.

6          THE COURT:  Understand it?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Did you discuss it with your attorney?

9          THE DEFENDANT:  I did, yes, sir.

10         THE COURT:  Is there anything about that agreement you

11   do not understand?

12         THE DEFENDANT:  No, sir.

13         THE COURT:  Did you read each and every paragraph?

14         THE DEFENDANT:  I did, Your Honor.

15         THE COURT:  Each and every page?

16         THE DEFENDANT:  I did, Your Honor.

17         THE COURT:  One part of that agreement says that you

18   are giving up your right of appeal.  Do you understand that?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  Do you understand that a defendant

21   normally has a right to challenge the conviction as well as the

22   sentence?  Do you understand that?

23         THE DEFENDANT:  Yes, sir, I do.

24         THE COURT:  Do you understand that by this agreement

25   you are giving up those challenges?  Do you understand that?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  So then on a later date, if you are

3    dissatisfied with the plea or you are dissatisfied with the

4    sentence, do you understand that by this agreement you would be

5    precluded, prevented, from filing an appeal seeking to overturn

6    the sentence or overturn the conviction?  Do you understand

7    that?

8          THE DEFENDANT:  Yes, sir, I do.

9          THE COURT:  Do you understand the one window by which

10   you would have a right of appeal would be concerning the

11   performance of your attorney?  Do you understand that?

12         THE DEFENDANT:  Yes, sir, I do.

13         THE COURT:  But you have already told me that you are

14   happy with your attorney's advice to you and involvement in

15   your case, have you not?

16         THE DEFENDANT:  Yes, sir, that's correct.

17         THE COURT:  Now, at the -- also in the plea agreement

18   it says what the maximum sentence is, that the court can impose

19   that sentence, and that this court does not have to follow the

20   recommendations of either the prosecution, defense, or anyone

21   else.  Do you understand that?

22         THE DEFENDANT:  Yes, sir.

23         THE COURT:  Now, at the end of the agreement are some

24   declarations.  They are in bold.  Do you see those

25   declarations?  There are five of them.

```
 1                 THE DEFENDANT:  Yes, sir.

 2                 THE COURT:  Have you read them before?

 3                 THE DEFENDANT:  Yes, sir, I have.

 4                 THE COURT:  Do you understand them?

 5                 THE DEFENDANT:  Yes, sir.

 6                 THE COURT:  And, Mr. Hollomon, are you in agreement

 7     with those declarations?

 8                 MR. HOLLOMON:  I am, Your Honor.

 9                 THE COURT:  All right.  Thank you.  And, Mr. Benjamin,

10     you are in agreement with those declarations?

11                 THE DEFENDANT:  Yes, sir, I am.

12                 THE COURT:  Now, did you sign that plea agreement?

13                 THE DEFENDANT:  Yes, sir, I did.

14                 THE COURT:  And when?

15                 THE DEFENDANT:  This morning.

16                 MR. HOLLOMON:  Judge, he is signing it now.  We

17     inadvertently signed two plea supplements so we are now signing

18     a plea agreement to go along with the plea supplement we signed

19     earlier.  He has reviewed it.  We both reviewed it earlier.

20                 THE COURT:  All right.  That's what I was about to ask

21     you, Mr. Benjamin.  So you all have reviewed that document

22     before?

23                 THE DEFENDANT:  Yes, sir.

24                 THE COURT:  When would you say the earliest time that

25     you reviewed that document?
```

1          THE DEFENDANT:  It's been last Friday -- Thursday or

2     Friday of last week.

3          THE COURT:  Okay.  So today is Tuesday.  So it would

4     have been, you said, last Friday?

5          THE DEFENDANT:  I think it may have been Thursday or

6     Friday.

7          THE COURT:  Thursday or Friday.  So have you had ample

8     time to review that document?

9          THE DEFENDANT:  Yes, sir.  And I went over it with the

10    attorney as well.

11         THE COURT:  All right.  Thank you.  And, Mr. Hollomon,

12    have you signed that document?

13         MR. LaMARCA:  I have, Your Honor.

14         THE COURT:  When did you sign it?

15         MR. HOLLOMON:  I signed it this morning.

16         THE COURT:  All right.  Thank you.  Now, Mr. LaMarca,

17    did you sign the document?

18         MR. LaMARCA:  I did, Your Honor.

19         THE COURT:  And when did you sign it?

20         MR. LaMARCA:  This morning.

21         THE COURT:  All right.  Thank you.  Now, let's turn to

22    the plea supplement.  Now, Mr. Benjamin, did you read the plea

23    supplement?

24         THE DEFENDANT:  Yes, sir, I did.

25         THE COURT:  And do you understand that?

```
1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  Any questions about it?

3              THE DEFENDANT:  No, sir.

4              THE COURT:  And, Mr. LaMarca --

5              MR. LaMARCA:  Yes, Your Honor.

6              THE COURT:  -- how many pages are contained in the

7     plea agreement itself?

8              MR. LaMARCA:  Seven pages, Your Honor.

9              THE COURT:  How many pages are contained with the plea

10    supplement?

11             MR. LaMARCA:  Seven pages, Your Honor.

12             THE COURT:  And thank you.  And the plea supplement

13    also ends with these declarations.  Is that correct?

14             MR. LaMARCA:  Same declarations that are -- that end

15    the plea agreement, Your Honor.

16             THE COURT:  Mr. Benjamin, do you agree?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  And again, are you familiar with those

19    declarations?

20             THE DEFENDANT:  Yes, sir, I am.

21             THE COURT:  Do you agree with them?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  When did you sign the plea supplement?

24             THE DEFENDANT:  Today.

25             THE COURT:  And, Mr. Hollomon, when did you sign it?
```

1        MR. HOLLOMON:  Your Honor, I signed it this morning

2   also.

3        THE COURT:  All right.  Will you please submit to me

4   the plea agreement and the plea supplement.

5        MR. HOLLOMON:  May I approach, Your Honor?

6        THE COURT:  You may.  Pass it over to Cherie here.

7     (Documents tendered)

8        THE COURT:  I have the plea agreement which is in the

9   form mentioned earlier.  I notice on page 7 of the plea

10  agreement under -- above date next to the name of Mr. LaMarca,

11  I see an "8" scratched out and a "10" placed there.

12  Mr. LaMarca, did you do this?

13       MR. LaMARCA:  I did, Your Honor.

14       THE COURT:  And are these your initials next to this

15  deletion?

16       MR. LaMARCA:  They are, Your Honor.

17       THE COURT:  All right.  Thank you.  All right.  That's

18  the only correction I see.  I turn now to the plea supplement.

19  And I see no changes on the plea supplement except to the very

20  left next to Mr. Hollomon's name you see a check mark.

21  Mr. Hollomon, did you intentionally put the check mark there or

22  was that inadvertent?

23       MR. HOLLOMON:  It was inadvertent.

24       THE COURT:  It's just a check mark between your name

25  and the words "attorney for defendant."  I'll make these

1    documents a part of the regular -- a part of the record in the

2    regular course.  The plea agreement will be a part of the

3    regular record where the plea supplement will have the special

4    attention prescribed by the local rules.

5         Now, Mr. Benjamin, I'm now going to determine the

6    factual basis for the government's prosecution here.  Listen

7    carefully to what the prosecutor has to say because when he

8    finishes I'm going to ask whether you agree with his

9    declarations.  If you do not, then I expect for you to speak

10   up.  Mr. LaMarca, go to the podium, please.

11        MR. LaMARCA:  Yes, Your Honor.  Thank you.  Your

12   Honor, if the government were put to its burden of proof, the

13   evidence would show that from about 2012 through 2014

14   Christopher Epps served as Commissioner of the Mississippi

15   Department of Corrections, an agency of the State of

16   Mississippi.  The defendant, Irb Benjamin, owned Mississippi

17   Correctional Management, Jail Solutions, also known as MCM, and

18   MCM is a provider of drug and alcohol treatment programs.

19        From about 2012 through 2014, MCM was under contract

20   with MDOC to conduct programs in Alcorn County and Simpson

21   County Correctional Work Centers, programs of drug and alcohol

22   treatment.

23        Beginning about 2012, the Federal Bureau of

24   Investigation began an investigation into the bribery,

25   kickbacks, and money laundering activities involving Mr. Epps.

1    Mr. Benjamin began paying Mr. Epps monthly kickbacks beginning

2    in January of 2012.  Shortly after, MCM received a contract

3    with MDOC for the drug and alcohol program at Alcorn County

4    Correctional Work Center.

5            In March of 2012, Simpson County was added to the MCM

6    program.  Mr. Benjamin began paying kickbacks for these

7    contracts to Mr. Epps in the amount of $7,000 per month.  These

8    payments, the evidence would show, were usually made through

9    the guise of a handshake as they greeted each other at the

10   office of Mr. Epps in Jackson, Mississippi.

11           During the investigation, the FBI video and audio

12   recorded Mr. Benjamin paying $7,600 in cash to Mr. Epps on

13   August 27th, 2014, in Mr. Epps's office here in Jackson,

14   Mississippi.  When confronted, Mr. Benjamin admitted providing

15   kickbacks to Mr. Epps beginning about 2012.

16           That at all times, herein stated that I've just

17   stated, the Mississippi Department of Corrections received

18   benefits in excess of $10,000 annually under federal programs

19   providing federal assistance to MDOC through the Office of

20   Justice Programs, one of which being the Statewide Automated

21   Victim Information Notification Program.  That these acts

22   conduct by Mr. Benjamin occurred in whole or in part in the

23   Southern District of Mississippi.

24           That would be the proof that the government would

25   submit should this case have gone to trial, Your Honor.

1       THE COURT:  All right.  Thank you.  Now, then,

2   Mr. Benjamin, did you hear what he had to say?

3       THE DEFENDANT:  Yes, sir, I did.

4       THE COURT:  Do you disagree with any of his

5   statements?

6       THE DEFENDANT:  No, sir, I do not.

7       THE COURT:  I told you earlier that by pleading guilty

8   you'll be waiving your rights under the Fifth Amendment.  Do

9   you remember that?

10      THE DEFENDANT:  Yes, sir.

11      THE COURT:  I have to ask you some questions, and

12  these questions will impact upon your Fifth Amendment rights of

13  incrimination or at least rights not to incriminate yourself

14  and questions designed to give me a better view of this whole

15  matter.  So then I'll start off how long have you known the

16  defendant Christopher Epps?

17      THE DEFENDANT:  Probably 20 years.

18      THE COURT:  And how did you meet him?

19      THE DEFENDANT:  He worked in the Department of

20  Corrections when I was working at the legislature.

21      THE COURT:  What was he doing at the Department of

22  Corrections?

23      THE DEFENDANT:  He was a correctional officer of some

24  standard.

25      THE COURT:  And you at the time, what was your

1  occupation?

2          THE DEFENDANT:  I was a member of the House of

3  Representatives, later on the Senate and later on worked for

4  the Senate.

5          THE COURT:  How long you were in the House?

6          THE DEFENDANT:  Four years.

7          THE COURT:  And in the Senate?

8          THE DEFENDANT:  Eight.

9          THE COURT:  And, of course, those are popularly

10  elected positions.

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  And what counties?

13          THE DEFENDANT:  Alcorn County -- Alcorn, Tishomingo in

14  the Senate and Alcorn in the House.

15          THE COURT:  Say that again.  Alcorn, Tishomingo and

16  what else?

17          THE DEFENDANT:  Alcorn -- the Senate district was made

18  up of Alcorn and Tishomingo County.  The House district was

19  made up of Alcorn County only.

20          THE COURT:  All right.  With regard to this criminal

21  enterprise which concerns us here in Count 2, who initiated

22  that criminality?

23          THE DEFENDANT:  Mr. Epps did.

24          THE COURT:  And how did he do that?

25          THE DEFENDANT:  He asked me for money, and I delivered

it to him.

THE COURT:  At the time he asked you money, what was his position?

THE DEFENDANT:  He was Commissioner of the Department of Corrections.

THE COURT:  So by that time, he had risen to the rank of Commissioner?

THE DEFENDANT:  Yes, sir.

THE COURT:  How long had he been Commissioner before he asked you for money?

THE DEFENDANT:  Well, to qualify it, I mean, there were always things that come along or he'd always make gestures and moves, "You've got to let me hold something, hold something," and I never would fool with it.  So that went along until 2010, '11.  And so I just took his gist and went on and never thought anything about it.

THE COURT:  This matter of, "Let me hold something," at that time when he was making those requests, did he have anything to give you in return?

THE DEFENDANT:  No, sir.

THE COURT:  So then how did you construe those comments, "Let me hold something"?

THE DEFENDANT:  He just said, "Put something in my hand.  Let me hold something."  That was just the comment that was made.

1      THE COURT:  Did you take him seriously?

2      THE DEFENDANT:  Well, I sort of did, but I just

3 brushed it off and went on.

4      THE COURT:  Did he make any demands upon you at that

5 time?

6      THE DEFENDANT:  Not at that time, he didn't.

7      THE COURT:  So then back to this matter of the onset

8 of this criminality, what led up to it?  Did you already have

9 contracts with the department?

10     THE DEFENDANT:  No, sir.  I already had contracts with

11 the counties where I was working.  We were in the process

12 building three new regional jails that I had contracts with the

13 counties.  And when we got about three fourths of the way into

14 the construction he came in and demanded money.  And he made it

15 clear that, *If I don't get paid, you don't get inmates*.  So I

16 was trying to protect the integrity of my clients.

17     That was my home there, and I had worked for those

18 jails since -- counties since 1996 on one, '97 or '98 on the

19 other one and had worked them through the process to try to

20 help them get a reasonable jail.  So, of course, we were ready

21 to get to the licklog as far as we were going to -- we was

22 under construction and going to be finalizing the operations,

23 and it's important to have inmates.

24     Key to it is you have to have -- inmates drive the

25 whole thing.  So that's when the demand came, and he made it

1　clear if we don't get money I don't get inmates, and I didn't

2　want the counties to be penalized in their project so that's

3　when I paid him.

4　　　　THE COURT:  Now, at the time were you in an elected

5　position?

6　　　　THE DEFENDANT:  No, sir, I was not.

7　　　　THE COURT:  Did you -- so at the time that these

8　matters were being constructed, you then were not elected?

9　　　　THE DEFENDANT:  I was not.  I left the Senate -- the

10　legislature in '92 was my last public service year.  I worked

11　for the state Senate from '92 until '93 to '96, and then after

12　'96, I went on my own in the ACA accreditation business, and I

13　was working with the regional jails and did the first two jail

14　projects, one in Marion County and one in Carroll County.  We

15　put those projects together for the counties and built them and

16　then did the accreditation for them.

17　　　　THE COURT:  I see.  So at this point you were in

18　private industry?

19　　　　THE DEFENDANT:  Yes, sir.  I ran a business from --

20　the construction projects ended in '99, I think, and then I

21　stayed with them and worked through them all the way through.

22　　　　THE COURT:  So then this matter of inmates, at the

23　time that the construction was going on, did you have any

24　contract with the Department of Corrections?

25　　　　THE DEFENDANT:  The counties had the contracts with

1   the Department of Corrections.  I never had a contract with the

2   Department of Corrections until 2011, I think it was, whenever

3   we did the drug and alcohol.  I take that back.  I had another

4   drug and alcohol program with DOC that started in Grenada when

5   I ran the Grenada jail.  And we started that in 2008, and I ran

6   a drug and alcohol program for the state inmates in the jail in

7   Grenada County.

8         THE COURT:  Okay.  So then back to this initiation of

9   this criminality, you said some points Mr. Epps approached you

10   and, what you said, threatened you?

11         THE DEFENDANT:  In a nice kind of way.  But under the

12   guidelines, he has -- he signs off on the construction plans

13   for the counties.  And, of course, we met with him all the

14   time.  But when we got to the point where we was getting ready

15   to put up inmates -- getting ready to finish construction, I

16   also serve with the counties to help them do the startup.  I

17   helped them buy -- show them how to buy equipment for the jail

18   to help them save money.  Helped them spend down on their

19   monies for buying the equipment and buying uniforms and all the

20   startup stuff for them.

21         So I work with the counties all the time.  And during

22   all this time, you had -- I was the main contact between the

23   counties and the Department of Corrections.  The commissioner

24   had very little or no connection at all with the county boards

25   of supervisors or the sheriff.  I ran that gamut for several

counties that I worked for.

So when we were getting to the final -- we were getting into the construction, which is about 11 months, so in that final deal that's when he came in and said he did -- he demanded money. "What's in it for me?"

I said, "Well, nothing."

"Well, you know you can't run it without inmates."

The kicker is that these housing contracts would only guarantee the counties 80 percent of the inmates that they contracted for. So if you contracted for 300, that's 240. But the counties needed to try to maximum the 300 because they built for the 300 inmates. So while he was -- the county would have to pay him, the state would have to pay him for the 240. He could play games with them on the other 60, which is that's where you make it or break it. That is what controls whether or not your jail project can be successful.

I had done projects in Marion County. I did projects in Carroll County and others and we were very successful, but it because if when the counties contracted for 300 inmates, they built a facility to house 300 inmates, the Department of Corrections funded -- filled them up to 300 inmates or pretty close to that number.

But the threat to bridge that agreement and only have to legally put in 80 percent was just almost a death blow for the county. It meant that the county is going to have to

absorb at lot of money that they didn't intend to and initially
went into the program.  So that was the buffer zone.  That was
the problem area.

THE COURT:  Okay.  And at that point did you perceive
that as a bribe?

THE DEFENDANT:  Yeah.  This is when he asked for
money, yes, sir.

THE COURT:  He asked you for money?

THE DEFENDANT:  Yes, sir.

THE COURT:  And I'm asking you did you perceive that
as a bribe?

THE DEFENDANT:  Did I perceive it?  I guess I did,
yes, sir.

THE COURT:  And did he state how much money you were
to provide him?

THE DEFENDANT:  He set the limit on what he wanted,
and it changed from time to time when that went up.

THE COURT:  Well, how stable was this limit?  Did it
change from month to month, six months to six month?  What?

THE DEFENDANT:  To begin with, yes, it started out
$1,000.  It went to 1500 and then went to 2,000.  So I quit
going.  I'd dodge him.  And then he would summons me to come
in, and then he summons me and said, "We need to go to 4,000."
So I'd go in to -- this happened in about 2011.  After we got
through the initial deal with those counties, that was a

1    one-time deal.  And then in 2011, when we started and then

2    whenever we got to the drug and alcohol programs is when he

3    went up to the large amount.

4            THE COURT:  So where would the money come from?  You

5    were telling me earlier that the facility was based on 300 beds

6    and that you had to have the 300 beds in order to meet your

7    costs.  So then where did the extra money come from to give to

8    him?

9            THE DEFENDANT:  I was paid a salary.  I took every

10   dime of that money out of my payroll, what my company made,

11   what I withdraw from the company as income, and I paid it out

12   of that.

13           THE COURT:  You paid it out of your salary?

14           THE DEFENDANT:  Yes, sir.

15           THE COURT:  What was your salary?

16           THE DEFENDANT:  We worked on -- we got $4,000 a month

17   to do ACA accreditation at each one of those facilities.

18           THE COURT:  At each facility?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  So then how many facilities were there?

21           THE DEFENDANT:  There was three involved here, but I

22   worked at about ten different facilities, county jails, and

23   other regional jails.

24           THE COURT:  So if it was ten facilities, were you

25   getting $4,000 from each?

1          THE DEFENDANT:  Yes.  Three of them I got 5,000.

2          THE COURT:  Was that per month?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Per month.  So you're make somewhere in

5     excess of $40,000 a month?

6          THE DEFENDANT:  That's right.  I didn't make it, but

7     that's what we charged.  We had a team of people who traveled.

8     A big problem with us is it's 200 miles from Madison County to

9     Alcorn, also to Hancock County.  So our biggest cost was trying

10    to get to a job.  We had professional people that worked for

11    us.  But we made money, but we did a service -- the only other

12    competition we had charged about twice what we charged to do

13    the same work.

14         THE COURT:  So out of that $40,000 that was coming in,

15    how much were you clearing?  Did you have to pay some other

16    employees?

17         THE DEFENDANT:  Yes, several employees.  Six or seven

18    employees.

19         THE COURT:  You have to expend other monies towards

20    their travel or --

21         THE DEFENDANT:  Their travel.  Furnished vehicles,

22    furnished travel expense for them, bought some uniforms for

23    them.  And then we had audit expenses.  Then we would go and

24    represent the jails before the American Correctional

25    Association, when they would approve them for certification.

1    We send our staff.  They would be in San Francisco or they'd be

2    in Detroit or Texas or somewhere.  So we bore all of those

3    expenses there.

4              THE COURT:  So then did you have to cut corners to pay

5    Mr. Epps?

6              THE DEFENDANT:  Well, we just live within the means.

7    We worked all the time at my place and we don't have RVs and we

8    don't have a second home or third home, and so we just try to

9    manage loss and so that's how we did it.

10             THE COURT:  So how much would you say that you

11   profited from your involvement?

12             THE DEFENDANT:  To be honest with you, Your Honor, I

13   didn't profit -- I lost money with Epps because it came -- I

14   did the work in all the locations, and I took the loss and he

15   took the money.

16             THE COURT:  You took a loss and he --

17             THE DEFENDANT:  It would have come out of what I would

18   have earned as income, and I went and paid tax as income just

19   like I had kept the money myself.

20             THE COURT:  Okay.  So you saying you were paid through

21   these ventures, and then you filed income taxes on them?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  And paid the tax too?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  Did you take deductions on it from any

1 | direction?

2 | THE DEFENDANT: I didn't take any deductions on the

3 | money that I paid to Epps, but I took all the expenses and

4 | everything, all the normal business deductions in running a

5 | business.

6 | THE COURT: These are regular business deductions?

7 | THE DEFENDANT: Yes, sir.

8 | THE COURT: So you didn't have any deductions that

9 | incorporated Epps?

10 | THE DEFENDANT: No, sir.

11 | THE COURT: So during the time period do you have a

12 | rough approximation of how much money you gave him?

13 | THE DEFENDANT: I think somewhere in the neighborhood

14 | of 200,000. I once said 175, but anyway it's somewhere from

15 | 180- to 225,000. There was some sporadic times I didn't pay

16 | him all the time but somewhere in that neighborhood of 225,000

17 | would have been a max, but somewhere in that range.

18 | THE COURT: These other businesses, did you depend on

19 | inmate participation for your other businesses too?

20 | THE DEFENDANT: Yes, sir.

21 | THE COURT: How so?

22 | THE DEFENDANT: All -- there was some -- there were

23 | other regional jails that had the same contracts. He never

24 | give any problem out of the contracts and projects that we were

25 | already on board with whenever he got kind of got in the car

1　with us.  He kind of -- he didn't go after some monies until we

2　got into building the three new ones.  That's Alcorn,

3　Chickasaw, and Washington.  That's when the deal started.

4　　　　　THE COURT:  And when -- your reference to this 180,000

5　to 225,000, that was in reference to those?

6　　　　　THE DEFENDANT:  Yes, sir.

7　　　　　THE COURT:  Would --

8　　　　　THE DEFENDANT:  That would be.

9　　　　　MR. HOLLOMON:  Overall.

10　　　　　THE DEFENDANT:  That's overall.  That was overall.

11　　　　　THE COURT:  All right.  Were you constantly -- were

12　you paying on a regular and constant basis until you started

13　ducking?

14　　　　　THE DEFENDANT:  I started ducking him to start with

15　because I was trying not to pay him at all.  We had several

16　heated discussions and I told him he couldn't do it, he

17　couldn't get away with it, it was wrong.  And he had comments

18　about it, and he'd say, "You make more money than I do," and,

19　"You can't run them without inmates."  So I paid it.  I'm not

20　happy about it, Your Honor.

21　　　　　THE COURT:  Was anybody else privy to these

22　conversations?

23　　　　　THE DEFENDANT:  Sorry?

24　　　　　THE COURT:  At the time you all had these

25　conversations, was there anyone else around?

1           THE DEFENDANT:  No, sir.

2           THE COURT:  So then when he was demanding money, did

3   there ever come a time when he was dissatisfied with your

4   payments?

5           THE DEFENDANT:  Yes, sir.  And he wanted more.  So he

6   kept up the level.  I don't know one time I gave him money and

7   it was short $100 and before I could get back home he called me

8   and says, "That document you left at the office is one page

9   short."  At least I knew he was counting it.  I didn't know

10  what the deal was because I never knew -- the money demands

11  really wasn't tied on to -- the initial deal that involved the

12  three construction projects I could identify.  But from that

13  point on, there was no way that none of the demands were tied

14  on any project.  It was just the demand in a business.  It kept

15  going up and up and up.  So I never knew where he was -- what

16  he was using his basis to determine how much money he was

17  wanting from me.

18          THE COURT:  Did it ever get too high?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  And at the time it got too high, what did

21  he want?

22          THE DEFENDANT:  I told him in May of 2014 before the

23  FBI came that I couldn't pay him no more, I was through, I was

24  going to quit.  And I said, "We've got to do something

25  different."

1        But I wanted to put him on notice, and then because I

2    was through, he said, "Well, we'll just cancel everything."

3        I said, "We're got to do something different, you

4    know."

5        I was not going to pay him in August, and because the

6    drug and alcohol contracts terminatined in December and I had

7    people working, I made my mind up that December I was going to

8    cancel them all and retire and be through with it.  We didn't

9    get to that for -- the feds came in.  I was happy to see them

10   in a way.  I remember thinking them the fact I didn't have to

11   pay him no more.

12            THE COURT:  And why is that?

13            THE DEFENDANT:  I guess because I didn't have to pay

14   him.

15            THE COURT:  You still were getting -- were profiting

16   some, weren't you?

17            THE DEFENDANT:  Well, I guess I was -- it was a

18   burden.  It was a strain.  I had a heart attack right in the

19   middle of it.  It was just a bad deal.  I was trying to get

20   away from it, and only he and I knew, and that was a load on me

21   to try to get away from it.

22        We profited, Your Honor, not because of the money but

23   because of the quality of work we did.  You see, our work for

24   all those facilities was graded by auditors every three years.

25   They'd come in, and they'd go over the documents and the

1    records and make sure that they maintained accredation.  So

2    our workload was we were rewarded because we were able to do

3    the job.

4         I understood the financing operations for the jails,

5    but a lot of times the counties and the sheriff didn't know.

6    If they get into trouble, I ended up being the problem solver.

7    When there was a problem with a regional jail, then The

8    commissioner would send me to go fix it, go help them, go fix

9    it.  Every time there was problem that I got dispatched into

10   some these projects and we did the work, very reasonable in

11   comparison to what we had to do, so we profited because we did

12   quality work and we didn't charge them an arm and a leg.  The

13   thing we did the last was that he just didn't get after us and

14   battle us and fight us like he could put us out of business

15   real easily.

16        THE COURT:  So how does that last statement about

17   having profited compare with your statement that you had lost

18   money doing the deal?

19        THE DEFENDANT:  Well, if I hadn't paid him, that's

20   money that I would have been able to kept personally.  The

21   contracts that we had with these -- that we had a fixed amount

22   of charges that we placed on providing service to each county,

23   and we stayed true to those -- we didn't jack them or boost

24   them or change them.  That was our regular rate, and we started

25   out with the originals at $4,000 a month.  We had one that we

1  did at $3,000 a month, and we had two or three because of the

2  distance they were from our home base here we charged them

3  $5,000 a month.  But it is all predicated and based on where

4  they were based at.

5          THE COURT:  So you're telling me but for his demands

6  you would have pocketed another 180,000 to 225,000?

7          THE DEFENDANT:  That's correct.

8          THE COURT:  That would have been legitimate money of

9  yours?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  And you instead had to give it to him?

12          THE DEFENDANT:  Yes, sir, that's right.

13          THE COURT:  Have you talked to him since you were

14  indicted?

15          THE DEFENDANT:  No, sir, I have not.

16          THE COURT:  Has he tried to contact you in any way

17  since you were indicted?

18          THE DEFENDANT:  No, sir.  I was instructed not to

19  communicate with him and two or three others, and I didn't.  I

20  haven't talked to him yet.

21          THE COURT:  So then with regard to this charge that

22  we've been discussing here, where in Count 2 you're alleged to

23  have knowingly and corruptly given, offering, or agreeing to

24  give something of value to Christopher Epps with intent to

25  influence or reward him in connection with the business

1  transaction or series of transactions of the Mississippi

2  Department of Corrections, do you agree with that?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  And do you agree that all of that involved

5  something of value of $5,000 or more?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Do you agree that it concerned the

8  awarding and retention of contracts to you and MCM?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  And that was for -- and the MCM aspect

11  dealt with alcohol and drug treatment services at MDOC

12  facilities in Alcorn and Simpson Counties?

13          THE DEFENDANT:  Yes, sir.  And I also ran one for them

14  in Grenada.

15          THE COURT:  Grenada.  Also Grenada.  Now, you have

16  discussed all of these matters with lawyer, have you not?

17          THE DEFENDANT:  Yes, sir, I have.

18          THE COURT:  And you have discussed all the potential

19  defenses that you could raise to this particular charge?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  During our discussion, you've told me that

22  Christopher Epps put pressure on you to provide this money to

23  him.  Mr. Hollomon, have you discussed the defense of duress

24  with your client?

25          MR. HOLLOMON:  I have, Your Honor.

1           THE COURT:  Are you satisfied that your client does

2 not have that defense?

3           MR. HOLLOMON:  I am, Your Honor.

4           THE COURT:  And why is that, Mr. Hollomon?

5           MR. HOLLOMON:  Your Honor, this was a transaction in

6 which Mr. Epps, in effect, controlled the lifeblood of my

7 client's business.  He controlled whether or not he could

8 continue in business or take him out.  My client was aware of

9 that and knew that.  That's why he agreed to these demands.  He

10 knew, as he stated earlier in the plea colloquy, that when he

11 was doing this it was, in fact, wrong, and he shouldn't have

12 been doing it.  It was illegal, but he did do it.  He made a

13 choice to do it instead of going to the authorities and made

14 that mistake.

15           THE COURT:  With regard to your client's profit

16 relative to these ventures, he has stated that he lost money

17 because the monies that he paid to Mr. Epps would have been

18 monies that would have gone into his pocket.  But, otherwise,

19 do you contend that he made nothing off of this illegal deal?

20           MR. HOLLOMON:  Judge, it's a little more complicated,

21 and we provided the documentation on his business records to

22 the government pursuant to a subpoena earlier this summer.  He

23 did lose money, I think, on the A & D centers.  We --

24           THE DEFENDANT:  Broke even.

25           MR. HOLLOMON:  Broke even, made virtually no money on

1  those.  I think the other aspects of his business, he -- again,

2  he made money, paid this -- had to pay this bribe money to

3  Epps, paid taxes on it, and it was money that would otherwise

4  have gone into his own bank account.

5           THE COURT:  But did he profit any money?

6           MR. HOLLOMON:  Judge, I believe he did, yes.

7           THE COURT:  Let me turn to the defendant.

8  Mr. Benjamin, did you profit at all?

9           THE DEFENDANT:  I'm sure I must have profited some,

10  yes.

11          THE COURT:  Let me repeat that question.  Did you

12  profit at all from this bribe?

13          THE DEFENDANT:  Yes, I think I probably did, yes, Your

14  Honor.

15          THE COURT:  You're not sure?

16          THE DEFENDANT:  Well, I'm sure that because of the way

17  that we were utilized in connection -- in relationship with the

18  department of correction when I was sent in the problem areas

19  with regional jails and ended up working for them that by

20  performing the service that I profited from that deal.  Now, he

21  sent me no because of the bribe, but he sent me because I was

22  the only on that he had that he thought could go in and make

23  the corrections and help them.  But as a result of that,

24  indirectly, yes, I'm sure I profited from it.

25          THE COURT:  All right.  Now, I ask you then as to

1   Count 2, how do you plead?  Guilty or not guilty?

2            THE DEFENDANT:  I plead guilty, Your Honor.

3            THE COURT:  All right.  Mr. Benjamin, since you

4   acknowledge that you are, in fact, guilty as charged in Count 2

5   of the indictment, since you know your right to a trial and

6   since you know what the maximum possible punishment is and

7   since you are voluntarily pleading guilty, I will accept your

8   plea of guilty as to Count 2 of the indictment and I hereby

9   enter a judgment of guilty against you as to that count.

10           Now, 70 days from now is approximately December 27th,

11  28th, somewhere around in there.  I'll be sentencing during

12  this time period.  Mr. Hollomon, do you have any motion with

13  regard to sentencing?

14           MR. HOLLOMON:  Your Honor, with regard to the date of

15  sentencing, we would ask that it be set beyond that period of

16  time into -- at least into at least January because of the

17  intervening holidays, and I think because there is going to be

18  some additional time needed here to obtain some additional

19  documents.  We've got to get some additional documents from

20  these other companies that were contracted with and which it is

21  alleged that my client worked for.  So we would ask for a

22  little additional time here.

23           THE COURT:  What are you requesting?

24           MR. HOLLOMON:  Judge, I would ask that we be set maybe

25  in the third week of January.

1            THE COURT:  What says the prosecution?

2            MR. LaMARCA:  Your Honor, we -- I had written down a

3    hopeful date in mid January so I think the third week would not

4    be unreasonable.

5            THE COURT:  Give me a date.

6      (Short Pause)

7            MR. LaMARCA:  How about, in conferring with defense

8    counsel, January 24th, which is a Tuesday at 9:30?

9            THE COURT:  January 24th at 9:30.  Mr. Lamarca, do you

10   anticipate calling any witnesses at the sentencing?

11           MR. LaMARCA:  It would depending on objections made to

12   the PSR, Your Honor.

13           THE COURT:  Okay.  And, Mr. Hollomon, do you expect to

14   bring witnesses to that proceeding?

15           MR. HOLLOMON:  Judge, it's difficult for me to say

16   now.  I know we will -- if we have differences over loss

17   amounts or what have you, we'll try to work those out with the

18   government and Mr. Whitver and U.S. Probation.  If not, of

19   course, we may have to let the court make a determination after

20   hearing evidence.  As of now, I don't know, Your Honor.

21           THE COURT:  Let me know as soon as possible.

22           MR. LaMARCA:  Yes, Your Honor.

23           MR. HOLLOMON:  Yes, sir.

24           THE COURT:  So I'm going set sentencing for

25   January 24th, 2016, at 9:30 a.m.  Meanwhile, Mr. Benjamin, I'm

going to ask the United States Probation to prepare the

presentence investigation report on you. Now, this report will

be very, very important because I'm going to read it.

Mr. Hollomon is going to tell you that I'm going to read it.

He has been over here in this court many times. So he's

familiar with my practice in dealing with presentence

investigation reports.

I'm going to read every last word of that presentence

investigation report. Now, Mr. Hollomon knows I'm going do it

and Mr. LaMarca knows I'm going to do it. But Mr. Hollomon

needs to know whether you have any objections to that report or

whether there's some matters in that report that only you might

know about that should be changed, modified, or added to. So

read every word of that report, discuss it thoroughly with

Mr. Hollomon so that he'll know whether to make objections to

anything in that report or whether to submit that additions

ought to be added to that report.

Now, this report will contain information about your

family life, your family, you background, where you went to

school. It will include information about your mental status,

your physical status, your association with physicians, et

cetera. All of that will be in there.

There will be matters that would touch upon any

criminal matters, if there are any. The report will describe,

as I said, your education. It will describe your state of mind

1    and everything else pertaining to you.  You need to read that

2    report and be sure that you read and understand all of it.

3         There will be a section in there on income taxes.  I

4    find that a number of defendants find when they get to the end

5    of that report they simply stop reading.  I know Mr. Hollomon

6    won't, but I'm going to say it anyway, that on this part about

7    income taxes, it will be in there as to whether you filed, when

8    you filed, et cetera.

9         But everything in that report needs to be reviewed

10   carefully.  There will be some computations in there on this

11   matter, points for this offense, points for any aggravating

12   features, points for any mitigating factors that should be

13   subtracted, criminal history score.  All of that stuff will be

14   in there.  The sentencing guideline range will be in there.

15   The reminder that the court can sentence you under the statute,

16   maybe there might be some -- maybe there will be matters on

17   relevant conduct, et cetera.  All of that will be in there.

18   So, again, I need you to pay special attention to everything in

19   there.  Will you do that?

20        THE DEFENDANT:  Yes, Your Honor, I will.

21        THE COURT:  Now, Mr. Benjamin, you have been convicted

22   now of a felony.  And as you know, a felon loses certain

23   rights, one of which is the right to bear arms.  Do you

24   understand that you cannot possess any type of firearm --

25        THE DEFENDANT:  Yes, sir.

1          THE COURT:  -- whether it's a pistol, rifle, or

2   shotgun.  It would not matter whether the firearm is a pistol

3   or rifle or shotgun.  It would not matter whether you would

4   expect to make use of the firearm for hunting, gun collecting,

5   or even self-protection.  Do you understand all of that?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Do you further understand this prohibition

8   about having a firearm also pertains to not only a pistol,

9   rifle, shotgun, et cetera, but also pertains to ammunition?  Do

10  understand that too?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  Do you further understand that this

13  prohibition about these matters will not disappear when all of

14  this is behind you?  Instead, this prohibition will last for

15  the rest of your life.  Do you understand that?

16         THE DEFENDANT:  Yes, sir, Your Honor.

17         THE COURT:  This matter of possession, it pertains to

18  actual possession where you might have these objects in your

19  hands, on your person.  It also pertains to constructive

20  possession where you might have these objects in an area over

21  which you have control from which you may readily obtain the

22  items.  Do you understand that?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  That refers to a car, to a house, to a

25  place beyond a house, but anywhere over which you have control

1  from which you may readily obtain the item.  Do you understand

2  that?  That could be a lockbox, that could be your storage bin,

3  anywhere over which you have control.  Do you understand what?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Any questions about any of this?

6          THE DEFENDANT:  No, sir.

7          THE COURT:  So you understand that if you are ever

8  apprehended with a firearm or ammunition in your possession,

9  that you would face the perils of criminal prosecution and

10  sentence.  Do you understand that?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  Any questions?

13          THE DEFENDANT:  No questions.

14          THE COURT:  Anything else from the prosecution?  I

15  assume the defendant is in liberty status.  Are you asking the

16  court to change that liberty status?

17          MR. LaMARCA:  No, Your Honor.  We have no objection to

18  the defendant remaining at liberty on his current bond.

19          THE COURT:  Mr. Hollomon, make your formal motion.

20          MR. HOLLOMON:  Your Honor, comes now the defendant by

21  and through his attorney and moves the court to allow him to

22  remain free on bond as he has been since I believe August of

23  last year.  He's made every court appearance on time, Your

24  Honor.  He's made every appointment with me in my office.  He's

25  done everything required of him.  I know he will continue the

1   conditions that his bond requires and make his next court

2   appearance on January 24th as directed by the court.

3           THE COURT:  All right.  Thank you.  Mr. Benjamin, I'm

4   going to grant that motion.

5           THE DEFENDANT:  Thank you, Your Honor.

6           THE COURT:  By that motion, you are telling me that

7   you're going to be here on January 24, 2017, at 9:30 a.m.  Is

8   that correct?

9           THE DEFENDANT:  Yes, sir, that's correct.

10          THE COURT:  By that motion, you're telling me that you

11  are not going to commit any further crimes.  Is that correct?

12          THE DEFENDANT:  That's correct.

13          THE COURT:  Then I'm going to allow you to remain free

14  under the current bond, and I'll expect to see you back here on

15  January 24, 2017, at 9:30 o'clock.

16          THE DEFENDANT:  Thank you, sir.

17          THE COURT:  All right.  I'll see you all then.

18          MR. HOLLOMON:  Thank you, Your Honor.

19          MR. LaMARCA:  Thank you, Your Honor.

20          THE DEFENDANT:

21          (Court Adjourned)

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3         I, CHERIE GALLASPY BOND, Official Court Reporter, United

 4    States District Court, Southern District of Mississippi, do

 5    hereby certify that the above and foregoing pages contain a

 6    full, true and correct transcript of the proceedings had in the

 7    aforenamed case at the time and place indicated, which

 8    proceedings were recorded by me to the best of my skill and

 9    ability.

10         I certify that the transcript fees and format comply

11    with those prescribed by the Court and Judicial Conference of

12    the United States.

13

14         This the 2nd day of January, 2017.

15

16                         s/ Cherie G. Bond
                           Cherie G. Bond
17                         Court Reporter

18

19

20

21

22

23

24

25
```