UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA

VS.                          CRIMINAL NO. 3:15cr00067HTW-FKB-1

IRB BENJAMIN




SENTENCING HEARING


BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE
MARCH 3, 2017
JACKSON, MISSISSIPPI






APPEARANCES:

FOR THE GOVERNMENT:    MR. DARREN LAMARCA

FOR THE DEFENDANT:    MR. JOSEPH HOLLOMON


REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012
_____

501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186

```
1              THE COURT:  Call your case, please.

2              MR. LaMARCA:  Your Honor, the matter before the court

3    is United States v. Irb Benjamin.  This is criminal number

4    3:15CR67.  Mr. Benjamin is present with his attorney, Joe

5    Hollomon, Your Honor, and is present for sentencing pursuant to

6    a plea of guilty to Count 2 of the indictment.

7              THE COURT:  All right.  And good morning to you,

8    Mr. Hollomon.

9              MR. HOLLOMON:  Good morning, Your Honor.

10             THE COURT:  And good morning to you, Mr. Benjamin.

11             THE DEFENDANT:  Good morning, Judge.  How are you this

12   morning?

13             THE COURT:  All right.  Mr. Hollomon, has your client

14   and you reviewed the presentence investigation report?

15             MR. HOLLOMON:  We have, Your Honor.

16             THE COURT:  Do you have any objections to the material

17   contained within that report?

18             MR. HOLLOMON:  Your Honor, we did have objections

19   which we have been able to resolve.  And at this time I think

20   the amended presentence investigative report submitted by

21   Ms. Harrell is accurate.

22             THE COURT:  And, Mr. Benjamin, do you agree with that

23   assessment?

24             THE DEFENDANT:  Yes, sir, I do.

25             THE COURT:  And, Mr. Hollomon, do you have any
```

1    evidence that you wish to submit on this matter of sentencing?

2         MR. HOLLOMON:  Your Honor, I have no evidence to offer

3    this morning.  We did submit to the court previously character

4    letters that were submitted on behalf of Mr. Benjamin as well

5    as a booklet put together showing what we consider to be the

6    effectiveness of the drug and alcohol program -- programs that

7    he ran for MDOC, and we have submitted that to the court

8    earlier.  Mr. Benjamin did not desire to bring all those people

9    in and have them testify, and so we submitted those to the

10   court in advance.

11        THE COURT:  All right.  Then let's talk first about

12   the letters.

13        THE DEFENDANT:  Yes, sir.

14        THE COURT:  I will just give the names of the persons

15   who submitted letters.  You have submitted to me a notebook

16   with laminated pages.

17        THE DEFENDANT:  Right, yes, sir.

18        THE COURT:  All right.  And then I have a letter from

19   Martha Benjamin.  I have a -- the next entry here are a number

20   of pictures of grandchildren and children, and it's two pages

21   worth.  I have that here.  And then following that, I have a

22   letter from David Benjamin, and he's the oldest son of the

23   defendant.

24        THE DEFENDANT:  That's correct.

25        THE COURT:  And then I have a letter from Donna L.

1    Benjamin, and she is married to his son --

2              THE DEFENDANT:  That's correct.

3              THE COURT:  -- David.  And they have been married for

4    14 years.  And then that letter is in two pages -- well, one

5    page.  Then the next letter is from Stacy Benjamin Bullard, and

6    she is an elementary schoolteacher in the Alcorn School

7    District, and she's married to Brian Bullard, and the couple

8    has two children.

9              THE DEFENDANT:  That's correct.

10             THE COURT:  And then there's a letter from Brian

11   Bullard, and he's a 12-year city letter carrier for the United

12   States Postal Service in Booneville, Mississippi, and he's been

13   married to his wife for 20 years.

14             Then there's Holly B. Jackson who's employed with the

15   Alcorn School District as a school counselor, and she has a

16   bachelor's degree in psychology and sociology, a master's

17   degree in counseling, and educational specialist degree in

18   school counseling, and she has written a letter in support of

19   her father.

20             And then there is Burton Benjamin, and he's the

21   youngest child of the defendant, and he has submitted a letter

22   in that respect, a short letter.

23             And there's a letter from a Jim -- is this Tom --

24             THE DEFENDANT:  Tomlinson.

25             THE COURT:  Tomlinson?

1          THE DEFENDANT:  Tomlinson, yes, sir.

2          THE COURT:  And he is a stepson of the defendant.

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  The defendant was previously married and

5    had, I think, four children to his first marriage and then

6    thereafter he remarried, and he remarried into a family with

7    this now wife and her children.

8          THE DEFENDANT:  That's correct.

9          THE COURT:  So he has both biological offspring and he

10   also has stepchildren.  And so this is one of the stepchildren.

11         And then there's a letter from Cindy Eubanks, and she

12   too is a stepdaughter, and she predictably writes great things

13   about him.

14         Then there's a letter from Nellie Benjamin Wren

15   W-R-E-N who is the brother of the defendant.

16         THE DEFENDANT:  Sister.

17         THE COURT:  Excuse me.  I said brother, but I meant

18   sister.  Who is the sister of the defendant.

19         Then there is Smith Benjamin, and he is a brother of

20   the defendant, and he has submitted a short letter.

21         And then there is a sister, Molly Forsythe

22   F-O-R-S-Y-T-H-E who has written a letter.  And as I said, she

23   is a sister.

24         And then there's a letter from a Jerry Wayne Benjamin

25   who is one of the 13 children of the parents of this defendant,

1    and he has written a letter.

2              Then there is Grace Gunter, G-U-N-T-E-R, who writes

3    that she is one of four sisters to the defendant.

4              And then there's a letter from Larry Benjamin, who is

5    a nephew of the defendant, and that letter is also laminated.

6              And then there's another nephew -- excuse me.  There's

7    another niece, Felicia Morris, who has written a letter, and

8    Cynthia M. Caldwell and -- who says that, "Martha Benjamin is

9    my daughter and Irb Benjamin my son-in-law."  And that person

10   has written a letter.

11             And then there's a letter from K.C. Caldwell Grist.

12   Caldwell is C-A-L-D-W-E-L-L and Grist is G-R-I-S-T of Tupelo,

13   Mississippi.  And he says, "I have known Irb Benjamin since

14   1987 when he served in the Mississippi State Senate, and I was

15   a young staffer for Governor Ray Mabus.  Since that time I have

16   come to know Irb as a loyal friend, trusted mentor, and even

17   brother-in-law."  So then he says other kind words in the other

18   three paragraphs of his letter.

19             That concludes the family session -- section of this

20   notebook, which contains letters from the family.  And then the

21   next section is a section which is entitled

22   "Business/Professional."  And in this section there are letters

23   from persons or businesses or persons affiliated with

24   businesses, associated with business and professional matters.

25   The first letter is written by a Tommy Irwin I-R-W-I-N of

1    Corinth, Mississippi.  And he just says that he was born in

2    Corinth, that he left for a number of years and returned to

3    Corinth and was elected as mayor of the city of Corinth.  He

4    then in the next four or five lines provides some words of

5    praise for the personality of the defendant.

6         He says, "I have known him personally as a fellow

7    resident of Alcorn County.  In all of my dealings with Irb, I

8    found him to be straightforward.  I do not believe he ever told

9    me anything on which I could not depend nor did he ever mislead

10   me about any matter.  He appeared in his dealings with me to be

11   a fair and personable individual," and that he hopes that the

12   letter will be of some benefit.

13        Then there's a letter from George looks like

14   Brumfield.

15        THE DEFENDANT:  That's correct.

16        THE COURT:  Retired superintendent of Brookhaven

17   Public Schools, where he served from 1981 to 1989.  And he

18   reflects that he was a close friend of the defendant while he

19   was chairman of the education committee for the Mississippi

20   Senate.  He talks about the legislation that Mr. Benjamin

21   helped pass called the Education Reform Act of 1982 which

22   greatly helped the public schools of Mississippi.  And he

23   attests to Mr. Benjamin's honesty and trustworthiness.

24        Then there's a letter from a Robert L. Robertson who

25   retired from state government in February of 2012.  He was

1   executive director of six statewide agencies, a university

2   professor, vice president of a university and deputy director

3   of IHL.  And he speaks about his history with the defendant,

4   how he met him back in 1991 when this defendant was a member of

5   the legislature and how they have become friends and have

6   remained such.

7          And then he also talks how he at some point had worked

8   with Mr. Benjamin while he working in the Senate on various

9   matters concerning lobbyist concerns.  He said, "He never asked

10  me for any pay or any favor for any and all of his good help.

11  He was also pleasant, kind, and respectful to me and my staff.

12  When he lost his Senate seat and had a job, I offered to pay

13  him $2,000 per month for January, February, and March to lobby

14  for MDOT.  He would not take the contract but continued helping

15  with our legislative needs.  I know little about his current

16  problem, but he was always kind, fair, and honest in all

17  interactions with me and my staff."  That's Robert L. Robinson.

18         Then there's a letter from a Joe Caldwell, and he says

19  that the defendant has been a close family member, close --

20  close family friend for many years, that he's known him since

21  the defendant taught in high school and -- taught at Kossuth

22  school, not necessarily high school, and knew him while he was

23  a senator for the state of Mississippi, that he's always been

24  an upstanding citizen, a valuable asset to Alcorn County and

25  the state of Mississippi.

1    And there's a next letter from Senator Tommy A.

2    Gollott, G-O-L-L-O-T-T, that he was a roommate of the defendant

3    during the years he was in the legislature.  He says, "He was a

4    good, honest person.  He never refused to help any and all his

5    constituents.  Whether it was a health issue, retirement issue,

6    hospitalization issue or whatever, he was always there for his

7    constituents.  He helped in any way that he could."

8    And he said that he was honored and is honored to call

9    him friend.  This is from Senator Tommy A. Gollott, Fiftieth

10   District, Harrison County.

11   Then there is a letter here from Joe McRaney, a former

12   county administrator in Rankin and Lauderdale Counties who

13   currently serves as comptroller in Holmes County.  He says that

14   he has been a friend of the defendant for the past 20 years.

15   He's always dealt with him in the counties that he represents

16   in an upright and honest manner, identifying many cost-cutting

17   measures to save county government thousands of dollars in jail

18   operation costs.  He says that he's aware of these events that

19   have -- that regard the defendant's guilty plea and he says

20   that he truly believes that this defendant has great -- has

21   already suffered extensively for his actions, that he's lost

22   credibility in the public's eye.  "I believe that an extended

23   prison term will serve as a tremendous hardship for his family.

24   I would ask for you to grant a sentence of probation or at

25   least the lowest possible sentence.  I understand you receive a

1  lot of letters prior to sentencing an individual, and you have

2  a heavy task before you.  My prayer is that you look upon this

3  particular case with leniency."  Again that's -- this is from

4  Joe McRaney, former county administrator in Rankin and

5  Lauderdale Counties and currently the comptroller in Holmes

6  County, Mississippi.

7          The next letter is from George Flaggs, Jr., mayor of

8  the city of Vicksburg.  And the mayor writes that he's sending

9  a character reference letter for the defendant whom he's known

10  for many years and have had numerous opportunities to greet and

11  have contact with.  He mentions his strong family, strong

12  support system from that family, that he's always held this

13  defendant in the highest regard and considered him an honest

14  person, that he's aware of the issues before the court but he

15  implores the court to take leniency on him in any way in which

16  the court is enable to do, that he's learned valuable lessons

17  from his past mistakes.  He also attests to his remorse and his

18  understanding, that is the defendant's, of the importance of

19  taking responsibility for his actions and behaviors.  And he

20  says, "Through his mistakes, I have always known Irb to be an

21  individual of integrity and high character," and he asks the

22  court to provide any consideration to the defendant.  Again

23  this is from Mayor George Flaggs, City of Vicksburg.

24          Then there's a letter from Nevin N-E-V-I-N Sledge

25  S-L-E-D-G-E, and this person is from Cleveland, Mississippi.

1  He serves as a state senator from Bolivar County, and said he

2  served from 1984 until 1992, and that during that time period

3  that he got along well with the defendant.  In fact, he

4  describes it as having hit it off with Benjamin.  "During those

5  nine years in the senate, Irb was my best friend.  I found him

6  to be totally honest, hard working, and a dedicated member of

7  the senate.  I valued his experience and his opinion.  No doubt

8  he was committed to helping the citizens of the state of

9  Mississippi.  For a number of years, he was the chairman of the

10  education committee, and he literately worked day and night to

11  improve the public education system for the children of this

12  state."

13      The writer goes on to say, "He was a marine in World

14  War II, and you get to know the character of your close friends

15  and buddies in the Marine Corps.  I was so impressed with

16  Benjamin's honesty, intelligence, and judgment that after a

17  period of time I consider Benjamin's friendship equal to those

18  friendships forged during the war.  He and his wife Martha are

19  great people, and I am so sorry that he somehow got himself

20  into this troubling situation.  Nevertheless, I still consider

21  him a friend.  He is a good man."

22      The next letter is from Warden Derek Mingo, spelled

23  M-I-N-G-O.  He's the Warden at Marion/Walthal Correctional

24  Facility.  He says, "I've had a lot of interaction with

25  Mr. Benjamin.  I have known him for more than 15 years and have

1    valued his advice and cooperation in helping the facility to

2    gain and maintain financial stability."  And he says that,

3    "While operating in his position as the ACA

4    director/coordinator for our facility, Mr. Benjamin has helped

5    us to meet the mandatory criteria set forth by the American

6    Correctional Association to receive accreditation from its

7    commission."  So then he calls the defendant a respectful

8    leader, held in high regard, and he asked me to find favor in

9    Mr. Benjamin.

10           The next letter is a former sheriff of Carroll County,

11   Mississippi, who served for two terms.  During this period of

12   time, the writer states that, "Mr. Benjamin served as our jail

13   consultant for the Carroll/Montgomery Regional Correctional

14   Facility in Vaiden, Mississippi."  And he says that, "As

15   sheriff, I was the chief correctional officer of the facility."

16   He's says that during this time period he got to know the

17   defendant and his wife through their various working

18   relationships and there was never a time where -- there was

19   never a time when the writer called on Mr. Benjamin that he did

20   not help with any problem and where he did not provide the

21   necessary help or information that was needed.  And then he

22   says he was always ready to help in any way he could.  He was

23   always fair, professional, and very knowledgeable in his job as

24   consultant.  "With his guidance, the facility went through two

25   ACA, that is American Correctional Association, audits

1   receiving perfect scores on all standards required."  And then

2   he again is pleased to have had the defendant working in that

3   capacity.

4          The next person who writes a letter is Barbara Ware,

5   W-A-R-E, who was hired by the defendant in February of 2012 to

6   be the project coordinator of the Alcorn County CWC New

7   Intensive Drug Treatment Program in Corinth, Mississippi.  And

8   this writer also has glowing things to say about the defendant

9   and has set out in some detail some of the charges, some of the

10  obligations that the facility had.  And she provided this to

11  show the tasks that were required of the facility and to

12  conclude that the defendant did a wonderful job in how to

13  perform his task.

14         Now, I have some more letters to go through, and I

15  would invite the defendant and his lawyer to have a seat so

16  that you all don't have to stand there.

17         MR. HOLLOMON:  Thank you, Your Honor.

18         THE COURT:  That last letter, as I stated, was from

19  Barbara Ware, W-A-R-E.

20         The next letter is from Fred Guenther G-U-E-N-T-H-E-R,

21  who signs his name with a J.D. and the CAT.  He identifies

22  himself as the alcohol and drug services coordinator of

23  Region 6 Community Mental Health Center d/b/a Life Help in

24  Greenwood, Mississippi, although Life Help officially serves 12

25  counties, mostly in the Mississippi Delta.  And then he goes on

to tell what he knows about the defendant.  He says that

Mr. Benjamin has never had any connection with Life Help but

the letter describes the writer's own relationship with

Mr. Benjamin, and "It's with sadness and regret that I even

write it.  I can barely, barely believe this letter is

necessary."

He states how he met Mr. Benjamin 11 years ago when

their paths crossed at the Grenada County Jail and Mr. Benjamin

thereafter was retained as a consultant for Mississippi

Corrections management.  And the writer says he designed

that -- that the writer designed and staffed two corrections

related substance youth disorder treatment programs and he and

the defendant became great friends, and he is -- he got a

chance to know him, to learn his personality, his character,

and he is now quite disturbed that the defendant has been

involved in any kind of criminal offense.  And, in fact, he

says it's very close -- "It is very close to unbelievable that

Mr. Benjamin has been involved in any kind of criminal offense,

no matter what it might be.  The Irb Benjamin I experienced,

whom I respect, with whom I became a friend, knew everything

about the design, construction, and management of a

correctional facility," and that he cared about the buildings,

cared about the inmates, et cetera.  So he implores the court

to give this defendant a chance at atonement and possible

future success and treatment and he concludes by asking the

1    court to take all of this into account.

2            The next letter is a character and reference letter in

3    support of the defendant written by a Kevin Williams, Sr.,

4    Sheriff, Bolivar County.  And he has had a professional

5    relationship with the defendant over the course of the last

6    five years, that defendant has always been courteous, helpful

7    and professional, not to mention fair.  So then he writes this

8    letter in support of him, and he met him through the -- he says

9    that "I am currently serving my second term as sheriff of

10   Bolivar County.  Upon taking office, Mississippi Correctional

11   Management began serving as the American Correctional

12   Association Consultant for Bolivar County Regional Correctional

13   Facility," and that the defendant was one of the members of the

14   consultant team that worked with that facility to prepare for

15   the ACA's assessment.  That's Kevin Williams, Sr., sheriff of

16   Bolivar County.

17           Then there's a letter from Dr. William W. Cannon,

18   who's a retired state senator from Lowndes County, Mississippi,

19   that's L-O-W-N-D-E-S and currently who is practicing veterinary

20   medicine in Columbus, Mississippi.  He is currently a board

21   member of the Mississippi Prison Industries Board elected to

22   the legislature at the same time that the defendant was elected

23   in 1976, and the two of them have remained friends since his

24   retirement from serving in the state legislature.  He says that

25   the defendant is a Christian and regularly supports his church,

1   loves his family, involved with his children, grandchildren in

2   ways to help them be good citizens and that his dealings with

3   the defendant were always above reproach, that the defendant

4   was always fair making decisions for the citizens of

5   Mississippi and he commends him to me.

6          The next letter is from Randy Hodges of Grenada,

7   Mississippi, and the president of MLM -- MCM, I'm sorry,

8   Mississippi Correctional Management, and he worked for 32 years

9   with the Mississippi Department of Human Services, retired as

10  regional director of child support enforcement in October of

11  2010.  And he says at the time he retired that he was

12  supervised by this defendant's wife, Martha, and it was through

13  Martha that this writer met the defendant in 2009.  And that

14  after the writer retired from MDHS, he went to work for Irb,

15  that is the defendant, at MCM.  His primary responsibilities

16  were to assist correctional facilities in obtaining and

17  maintaining ACA accreditation, and their facilities received

18  100 percent compliance.  And then he says that in 2015 the

19  defendant stepped down as president of MCM and appointed him,

20  the writer, as president.  Again the writer is Randy Hodges.

21         And he says glowing things about the defendant in his

22  letter, and he mentions family commitments and loyalty and the

23  bonds that the families have with each other, and then he gives

24  some examples of the caring and generous personality and

25  commitment of this defendant.  He says that, "One night we were

having some really bad cold weather.  When the defendant found out I didn't have electricity, he told me to take my wife to a motel and he would pay for it.  One time I drove to south Mississippi to work.  When I got there, I realized I had left my money and credit cards at home.  I was four hours from home and had no way to buy gas, food, or pay for a motel.  I called the defendant, and he drove two and one half hours to bring me $500.  I told him $200 was all I needed.  He insisted I keep the $500 just in case."

Then he says, "I also know that he has helped out one of our part-time employees when she was going through some difficult times from a divorce and having financial problems." So he concludes that this defendant is a God-fearing Christian man whom he would -- for whom the writer would do anything, and he says that he knows that he would do anything for the writer.

Then I have a letter from Jayna Peterson, J-A-Y-N-A Peterson.  And this is a former employee of Mississippi Correctional Management, that she began working there in November of 2012 after having retired a month earlier from the Mississippi Department of Human Services.  She says that "Mr. Benjamin's wife was my supervisor at the time of my retirement so I was already -- so I already knew of the defendant."  And then she says that she became fond of the defendant after having worked side by side with him recognizing his hard work and his commitment to his job and to his staff

1   and to the task at hand, that he's always available.  And then

2   she says, "I only left MCM this past March when the facility

3   lost most of the contracts that were close to my home," and it

4   is becoming difficult for the writer to manage her work with

5   her husband's rental properties.

6         And she concludes by saying that she has no

7   reservations about writing this letter, that the defendant has

8   become a very dear friend, always fair and always encouraging.

9   "He appreciated my work and he let me know it.  I could not

10  have asked for a better boss.  I will always consider him to be

11  my friend, and my prayers are with him and his family and with

12  you in the decision that you must make."

13        The next letter is from a Dan Robinson.  Dan Robinson

14  is the past president of Financial Service Centers of

15  Mississippi Association, and this defendant was a lobbyist for

16  that particular organization.  That's Financial Service Centers

17  of Mississippi Association.  The writer says, "Our association

18  was trying to get regulations passed, and I was young and had

19  no experience with such.  I learned very quickly that Irb was

20  not your typical lobbyist.  He was a peacemaker, kind, and

21  considerate.  He did not try to, quote, unquote defeat our

22  enemies on the legislation.  His way was to get us to

23  understand them and to get them to understand us."

24        So then the writer, that is Mr. Robinson, says that he

25  was president of that association for almost 20 years, that

1    during this time period the defendant was the lobbyist for the

2    organization and never once did he ever suggest anything that

3    even had a resemblance of impropriety, not once.  "In fact, he

4    often counseled me to become aware of questionable politics

5    that some of the elected official may ask for or seek."  So

6    then he says that he has maintained his high -- his valued

7    professional relationship with the defendant since, "He's the

8    kind of man that you respect and admire and wish you could be,

9    quiet man in a crowd but a loud voice of wisdom and reason

10   concerning things that truly matter.  Always very Christ like

11   with words of encouragement, obvious love in his heart and a

12   big smile on his face.  I would not hesitate to call him right

13   now to ask for his advice on any situation."

14        This writer acknowledges that he only has limited

15   information about this matter.  He says, "Of course, the

16   limited information I have read concerning Irb and the

17   indictment deeply saddens my heart for him and his family.  And

18   anyone who truly knows Irb feels the same.  In my opinion, if

19   Irb is guilty of any wrongdoing, it is because the one in

20   position of authority said, 'this is the way it has to be for

21   to you do your business.'  Not because Irb suggested it.  It's

22   a shame and those in position of powers abuse those powers."

23        So he asks that, "I pray that you would hold

24   accountable those who dictate self-serving policies by their

25   positions of authority, and I pray you will be lenient on the

1   defendant Irb or anyone else who committed acts such as this at

2   the risk of losing their businesses and income."  He concludes

3   that, "This defendant is a good man whom he has much respect

4   and love regardless of the outcome of this case."  He says, "I

5   would be willing to stand in person anywhere at any time on

6   behalf the defendant."  This is again a letter of Dan Robinson,

7   past president FCSM, which is Financial Service Center of

8   Mississippi Association.

9           Then I have a letter from Joel Yelverton

10  Y-E-L-V-E-R-T-O-N.  First name Joel, J-O-E-L, a local

11  consulting firm which represents a variety of clients,

12  including 26 railroads, a computer services company, a

13  municipality, and county tax assessors and collectors from all

14  82 counties.  So he calls the defendant, "a dear friend whom he

15  has known for almost his entire 35-year career," first when the

16  defendant served as a state senator and later when he retired

17  from the senate and managed his own company.  They are friends

18  to this day and that the defendant is fair, honest, loyal to

19  his family, friends, and business associates.

20          He points out that in 2009, he, that is Mr. Yelverton,

21  started his own consulting firm and he was struggling at the

22  time.  Then he saw the defendant at the capitol who told him

23  that he had heard that he, Mr. Yelverton, was on his own and

24  that he then, after being invited to come by the defendant's

25  office, took him up on that, went by his office, and he --

well, he said he was invited to come by the office so then he

thought he needed to get some directions to his office.  When

the defendant asked him where his office was located, that is,

where Mr. Yelverton's office was located, Mr. Yelverton stated

that his office was located at his kitchen table and out of the

back seat of his car.  And so then the defendant pointed to a

vacant desk in his office and informed Mr. Yelverton that he

would be honored to have him share his space rent free.  He

just wanted to show kindness and support to a friend, and that

is the type of person that is the defendant.

So the next paragraph, Mr. Yelverton says, "I do not

know any details about the case.  However, from my direct

knowledge of his selfless character, I surmise that Irb's

actions were most likely rooted in his concern for the clients

he served and/or the people dependent on him for employment.

In summary, I cannot stress to you enough that my personal

longstanding friendship with Irb has always shown him to be

fine in character, loyal and humble.  He's a good soul."  And

he asked me to take all of this into consideration.

The final category is a number of letters from persons

who are deemed to be friends, and the first is from New Birth

Missionary Baptist Church, and that's in Gore Springs,

Mississippi.  Reverend Clarence Buchanan is the pastor.

Brother Jimmy Willis is the chairman of deacons.  That's on the

letterhead.  And the letter is written on behalf of the

1  membership at New Birth Missionary Baptist Church, Gore

2  Springs, Mississippi.

3        And it says, "We offer this letter for the court's

4  consideration."  And the writer, who did not sign the letter,

5  says that, "The defendant became involved in the Grenada County

6  Jail Outreach Program that the church initiated to cater to

7  inmates at the Grenada County Jail, and he far exceeded

8  expectations in assisting the church with the church's goal

9  conveying a positive message to those who are incarcerated, and

10  he would frequently aid the congregation in soliciting and

11  fundraising efforts, was always concerned about the well-being

12  of others.  Through the years, he became involved with helping

13  our church not only as a whole but also by assisting specific

14  members of the church community when they experienced personal

15  burdens."  Then he asked the court to consider mercy and

16  leniency.

17        Now, this letter is not signed.  I read off the name

18  of the pastor on the letterhead, and I read off the name of the

19  chairman of deacons, that is Pastor -- that is, Brother Jimmy

20  Willis who is chairman of deacons and Reverend Clarence

21  Buchanan, who's the pastor.  Mr. Hollomon, do you know who

22  wrote the letter?

23        MR. HOLLOMON:  Your Honor, I'm told that Reverend

24  Buchanan, the pastor, is the author of this letter.

25        THE COURT:  All right.  Thank you.  Next letter is

1   from Patty Horton, H-O-R-T-O-N, who says she's known the

2   defendant since 1982 when he was a state senator.  And she says

3   very kind things about him too and that she's stayed personal

4   friends with him, his wife and family, over the years since he

5   left the senate.  "During that time I've only known him to be

6   helpful and a fair businessman and a friend," and he asked me

7   to consider the humble and caring person that the defendant is.

8        The next letter is from a Pam Prestage

9   P-R-E-S-T-A-G-E.  And the first name is Pam P-A-M.  And she

10  calls the defendant her good friend, and she says that she met

11  him when they were dating so this is how I came to know him.

12  "As I've known him for approximately 20 years, I've never known

13  him to be anything but fair, kind, and generous.  He's willing

14  to listen to both sides of an issue and then make the best

15  choice.  Family and friends are very important to him.  He

16  would do anything for anyone.  He is of impeccable character

17  and is a man of integrity.  He's impartial.  He treats everyone

18  with dignity and respect.  He has lived his life serving others

19  and being available for those who may need them."  And he

20  says -- and writer says that she has absolutely no reservations

21  about what she has said in her letter because this is the

22  honorable man that she knows.  She asked me to take all of that

23  into account as to his character when the court sentences the

24  defendant.

25        The next letter is from James W. Dye D-Y-E.  And this

1   person has a very short letter that says, "I'm a resident of

2   Alcorn County, and I know his brother for 25 years and members

3   of his family and would like a heartfelt request of mercy from

4   the court on behalf of the Benjamin family."

5       The next letter is the from a Vicki Dodd, V-I-C-K-I L.

6   D-O-D-D, and she says that the defendant is her friend.  She's

7   known him since 1999 when he was instrumental in obtaining

8   regional correctional facility for Carroll and Montgomery

9   counties.  "I was the office manager at time, and Irb was our

10  key consultant.  What began as a professional relationship

11  progressed over the years to a dear friendship with Irb and his

12  wife, Martha."

13      And she says she's a single parent who has encountered

14  her various ups and downs over the years and during her life

15  and that this defendant -- this defendant has been a constant

16  source for her and three children when she had absolutely no

17  one else to which to turn -- to whom to turn.  "He and his

18  wife, Martha, have been like family to me.  And I sometimes ask

19  myself why were they so kind to me, and why did Irb always,

20  always have my back when I needed help?  The answer is simple

21  to me.  God placed Irb in my life.  He knew Irb was one of his

22  compassionate angels he put on this earth to help others.  Irb

23  has no doubt fulfilled what God sent him here to do, but he has

24  so much more left to do."

25      So the letter concludes in the last paragraph saying

1   that this defendant is a wonderful man with wonderful family

2   and that he is someone who is entitled to leniency, that the

3   writer knows that the court has a difficult job, but she truly

4   wants the court to know what kind of person this defendant is.

5           The next letter is Talmadge T-A-L-M-A-D-G-E "Tee" in

6   quotations T-E-E Golding G-O-L-D-I-N-G, former Montgomery

7   County Chancery Clerk for 28 years.  "It was during one of my

8   teen -- one of my terms in office that I met Irb Benjamin.

9   Montgomery County was trying to find a way to build a jail due

10  to our jail being closed due to not being able to obtain

11  liability insurance.  We needed a jail in the worst way as the

12  cities of Duck Hill, Kilmichael, Winona, and Vaiden always use

13  our county jail."  So the writer speaks about the involvement

14  of this defendant in making that become a reality and says that

15  in all the writer's dealings with the defendant that he was

16  fair, knowledgeable, and efficient.  And so the writer says,

17  "In closing, I would like to let you know that during my 28

18  years as an elected official I had, many, many opportunities to

19  write letters on behalf of people, but I have written less than

20  10 during those years."  That is, during those 28 years.  "I am

21  thanking you in advance for all your consideration in this

22  matter."

23          The next letter is from a William M. Billingsley who

24  is the retired health care executive -- who is a retired health

25  care executive.  And the person has owned businesses throughout

1    Mississippi for the past 21 years and saying that the writer

2    met the defendant through his father-in-law, Senator Bunkey

3    Huggins, from Greenwood, who was Mr. Benjamin's desk mate and

4    dear friend when they served in the state Senate.  "Sadly

5    senator Huggins passed away in 2006, but my friendship with and

6    affection for Mr. Benjamin has remained strong.

7         The person has had no business dealings with the

8    defendant and the relationship is purely personal, the writer

9    having grown to know the defendant as a fair and reasonable

10   man.  And the person also talks about his commitment to his

11   family, his children, his entire family, and he's also been a

12   dedicated public servant who has tried his best to help the

13   people of Mississippi.  He has much more to offer.  So he asked

14   me to take all that into account with regard to sentencing.

15        These are the letters that the court has received, and

16   they're in a notebook that is styled in bold letters "Prepared

17   for Honorable Henry T. Wingate, United States District Court

18   Judge, Southern District Mississippi, Prepared on Behalf of Irb

19   Benjamin."  And there's a picture of the defendant, and under

20   that is, "Prepared by Martha Benjamin."  I will make this a

21   part of the record unless the prosecution is offering some

22   well-crafted objections.  Does the prosecution have any

23   objections?

24        MR. LaMARCA:  No, Your Honor.

25        THE COURT:  I will accept the book into evidence.

1     (Exhibit D-1 marked)

2          THE COURT:  Now, the other book that I have in front

3     me, I will not go through all of this.  I have looked through

4     the book, and I see tabs and also have looked through the book

5     to gain an understanding of what is involved in this large

6     notebook.  And the notebook has some interesting -- well, the

7     whole notebook is interesting, but there are some things that I

8     find of particular interest.  For instance, there's a

9     recidivism report in this book, and it's on -- it's under the

10    heading of "MCM Audit Scores."  And I'm always interested in

11    recidivism reports.

12         But anyway, there are a number of pictures here,

13    graduates in various years and letters submitted by these

14    particular people.  Well, instead of poking around, let me just

15    tell you what this book does.  The first page talks about the

16    purpose of the book.  It is to show the quality of works and

17    results of the therapeutic alcohol and drug treatment program,

18    that shows these programs have been successful and meaningful

19    to the participants.  And so that's the purpose of this

20    notebook.  And this book was submitted to me back in February.

21    That's the date on the top.  I don't think I got it back in

22    February.  Did I get it in February?

23         MR. HOLLOMON:  You did, Your Honor.

24         THE COURT:  I thought I got it after that.

25         MR. HOLLOMON:  I can't remember the exact date, but it

1    was February, Your Honor.

2             THE COURT:  I was thinking I got it right after.  But

3    okay.  But the cover letter is February 24th, 2017.  The first

4    tab is about Alcorn County graduation, and it has some colorful

5    pictures here.  Therapeutic Alcohol and Drug Program, Alcorn

6    County Community Work Center.

7             The second page has a picture of Christopher Epps and

8    a picture of Mr. Benjamin, president, Mississippi Correctional

9    Management.

10            The next page has picture of Jerry Wilson -- excuse

11   me, Jerry Williams, MDOC deputy commissioner.  And then next to

12   that is John Hopkins, MDOC Director of Treatment Programs Under

13   Special Treatment.

14            And then there's a picture of some of the instructors

15   in the program.

16            Thereafter are some certificates and a class

17   graduation and all the people who were there.

18            Anyway, there's a number pictures here of these

19   inmates who participated in the graduation celebration.  I was

20   looking again for the photographer.  Mr. Hollomon, who was the

21   photographer?

22            MR. HOLLOMON:  Your Honor, Irb tells me that it was

23   one of his employees on the staff.  Various employees at

24   various times just trying to memorialize the graduation

25   ceremonies and to demonstrate some of the good his program was

1  doing.  So I'm not sure we can identify over a period of time

2  exactly who it was.  But it was someone on his staff.

3           THE COURT:  All right.  He did a fine job of taking

4  these pictures.  And some of the names in here are persons who

5  wrote a letter to the court.  And then they have the graduates

6  of 2012, and there's a number of pages and comments from the

7  graduates where they speak about the things they liked about

8  the program, what the program has done for them, how they felt

9  about being in the program, et cetera.  So that's throughout

10 the book.

11          Then over further, there are the words of "One Day at

12 a Time."  And in the first part of the book, there's a picture

13 of the inmate who performed at the graduation singing that very

14 song, "One Day at a Time."  So the words of "One Day at a Time

15 are here, you know, in the book.  And, of course, we all know

16 the significance of "One Day at a Time" for those who are

17 trying to recover from alcohol and drug abuse.

18          Then there's a tab for Simpson County graduation, and

19 this occurred at October 2016, 2012.  And it's a joint venture

20 by the Mississippi Department of Corrections, Christopher Epps,

21 Commissioner, Mississippi Correctional Management, Inc., Irb

22 Benjamin, President, and Simpson County CWC.  And just as with

23 the section I dealt with earlier, there are pictures of the

24 commissioner, Christopher Epps, and Mr. Benjamin and special

25 appreciation to Jerry Williams, MDOC Deputy Commissioner;

1    Barbara Ware, program coordinator; Fred Guenther

2    G-U-E-N-T-H-E-R, program consultant; and John Hopkins, MDOC

3    director.

4            Then there's a program for the service of graduation,

5    and then these pictures are just like the pictures we saw

6    earlier, except they are pictures of a different ceremony.

7    There are a number of pictures that are well known -- well

8    provided.  Then after that are the graduates of 2012 with

9    inmates holding up their certificates while they are in cap and

10   gown.  And then each one -- most of them have written some

11   appreciation for the program in their own handwriting, and that

12   too is laminated just as it is in the prior section.

13           So this -- then we come to Simpson County Therapeutic

14   A & D, and it's by Clifford Triplett.  And Clifford Triplett

15   also wrote a piece on the road to recovery.  And thereafter are

16   some notations such as a story about footprints, and it is an

17   oft repeated story of a conversation wherein one discusses

18   Jesus eventually picking up a needed person and only having

19   two -- one footprint there at one point because the person

20   needed help.

21           Then there is the recidivism chart that I referred to

22   earlier, and I looked at this recidivist chart as soon as I got

23   the book, as soon as I saw it, because I'm interested in

24   recidivism.  And, Mr. Hollomon, who compiled this study?

25           MR. HOLLOMON:  Your Honor, this was provided my client

1    by MDOC.

2         THE COURT:  Okay.  All right.  Thank you.  The report

3    day is May 23, 2014.  Then there's some compliance scores in

4    another section.  And after that, there's a letter section

5    where persons wrote a letter to the defendant like Mr. Guenther

6    G-U-E-N-T-H-E-R.  And then Barbara Ware whose name has come up

7    before.  And it has the same information that she submitted to

8    me in a separate letter that I read earlier.  And then at the

9    back is a full picture of her at the podium at one of the

10   graduation ceremonies.

11        Now, is there any objection to my court placing this

12   into evidence?  From the prosecution?

13        MR. LaMARCA:  Your Honor, I'd like to quickly scan to

14   make sure there's no personal identifying information in it

15   that may have to be redacted.

16        THE COURT:  Could you complete that scan.

17        MR. LaMARCA:  Yes, sir.

18        THE COURT:  But contingent upon your notions about

19   personal data, the court will enter that book into evidence

20   subject to any corrections I need to be made to edit personal

21   information.

22        MR. LaMARCA:  Yes, sir.  Thank you.

23     (Exhibit D-2 marked)

24        THE COURT:  Now, Mr. Hollomon, you can stand right

25   there.  I have reviewed those two books and placed those two

1   books in evidence.  Now, are there any other matters that you

2   wish to submit by way of documents?

3          MR. HOLLOMON:  Your Honor, we have no other evidence

4   or documentary evidence to offer at this time in support of

5   Mr. Benjamin or related to the 3553 factors.  We did file a

6   motion for a downward departure.

7          THE COURT:  I was going to take that up in just a

8   moment.  Stand there.  Hold it.

9          MR. HOLLOMON:  Yes, sir.

10         THE COURT:  So you don't have any more evidentiary

11  materials?

12         MR. HOLLOMON:  No, Your Honor.

13         THE COURT:  And you don't have any more witnesses --

14         MR. HOLLOMON:  No, Your Honor.

15         THE COURT:  -- that you wish to call?

16         MR. HOLLOMON:  No, sir.

17         THE COURT:  All right.  Thank you.  I'll come right

18  back to you.

19         MR. HOLLOMON:  Yes, sir.

20         THE COURT:  Now, then, let me turn to the prosecution.

21  Let me interrupt you in looking through the book for those

22  personal -- for any personal information.

23         MR. LaMARCA:  Yes, sir.

24         THE COURT:  Do you have any evidence that you wish to

25  submit to the court by way of evidence?  Excuse me.  Do you

1    have any evidence you wish to submit to the court by way of

2    witnesses or documents?

3              MR. LaMARCA:  I do not, Your Honor.

4              THE COURT:  Okay.  Thank you.  Let me turn back to

5    you, Mr. Hollomon.  You have a motion for downward departure.

6              MR. HOLLOMON:  Yes, Your Honor.

7              THE COURT:  All right.  Now, talk to me about your

8    motion for a downward departure.

9              MR. HOLLOMON:  Yes, Your Honor.  Your Honor, we move

10   for a downward departure to ask the court to consider a

11   downward departure in this case pursuant to the United States

12   Sentencing Guidelines 5H1.1 and 5H1.4 based on the defendant's

13   age and health conditions.

14             THE COURT:  Now --

15             MR. HOLLOMON:  As reflected in the presentence

16   investigative report, Mr. Benjamin is now 70 years of age, and

17   he suffers from a number of chronic health issues.  In 1999, he

18   was diagnosed with idiopathic pulmonary fibrosis which

19   adversely affected his lungs, and Irb was told at this time,

20   Your Honor, he really wasn't expected to survive that illness.

21   It causes the lung, as I understand it, to dry up.  And it

22   seldom reverses itself.

23             In Irb's case, he attributes it not only to his

24   medical care but a lot of prayers from people.  The condition

25   did ultimately reverse itself and his lugs regenerated,

1    although they are still affected.  And he's affected today by

2    changes in -- particularly changes in temperature causes him to

3    feel the effects of it.

4         Then in August of 2012 he suffered an acute myocardial

5    infarction and underwent heart bypass surgery.  He's continued

6    to have problems with heart palpitations and an irregular

7    heartbeat.

8         He also suffers, Your Honor, from diabetes, diabetic

9    kidney disease, chronic kidney dysfunction, hypertension, fatty

10   liver, sleep apnea, and gout.  And a letter from his primary

11   care physician reflects that, which was included in the

12   presentence investigative report from Dr. Samuel Peeples, and

13   he terms those conditions serious and notes that this

14   combination of medical problems puts him at a very high risk

15   for complications and notes that it will -- his medical

16   conditions will require close and intensive followup.

17        We also, Your Honor -- he also I would state to the

18   court as reflected in the presentence investigative report is

19   on a number of medications which are all enumerated in there.

20   And I know the court has already seen that.  I wouldn't

21   elaborate further.

22        But we also move, Your Honor, because of his age --

23   Mr. Benjamin is 70 years old, has lived his life honorably up

24   to this point.  He's worked, paid taxes.  He's served in the

25   state legislature and state senate.  He helped promote and pass

1    important legislation related to education and to the state

2    highways which bettered this state for the citizens of this

3    state.  And he is -- I think the overwhelming thing that I have

4    learned from Irb being around him for the past year and a half

5    is his humility.

6         He doesn't really want to boast about they these, and

7    I don't mean to boast this morning, but they are true.  So he

8    has led a life of accomplishment and life he could be proud of

9    up until the time he met Chris Epps and this situation

10   developed.  And for those reasons, both his age, his life of

11   accomplishment, and his chronic health issues, which are

12   serious at this point, we would ask the court to consider a

13   downward departure, Your Honor.

14        THE COURT:  Now, Mr. Hollomon, as you stated, this

15   information about his health is contained within the

16   presentence investigation report.  And the letters relative to

17   such from the doctors are also in the presentence investigation

18   report.  There are two doctor letters that are included, and

19   there is a chart which sets out all of his ailments, the

20   medications that he takes as well as who the medical provider

21   was for the medication or is for those medications.  And I've

22   seen all of those and they are set out here.

23        So on the first matter, that is, on the health matter

24   with regard to gout, the letter says this has improved on

25   treatment with medication.  And then with regard to diabetes,

1   the letter says that inasmuch as he has placed himself on an

2   exercise regimen, that his -- he has chronic kidney disease but

3   his diabetes has done better or at least did better when he

4   wasn't as weighty as he later became because he gained

5   something like 30 pounds, I believe, in the last eight months.

6          And then he has -- I don't know if you mentioned sleep

7   apnea.  Did you mention that?

8          MR. HOLLOMON:  I did, Your Honor.

9          THE COURT:  Okay.  Because it says here he has a

10  history of borderline sleep apnea that I underlined and that at

11  times he has not gotten he's weight down.  I underlined that

12  too, and that he was going to be on the verge of morbid

13  obesity.  And all of this is hearing -- with the hypertension

14  and all of that, but my question is is usually on the downward

15  departure, we are talking about some factor that has not been

16  considered by the writers of the guidelines.  So are you saying

17  that this matter of medication would be such a matter that is

18  generally outside of the consideration by the sentencing

19  guidelines?

20         MR. HOLLOMON:  We do.  Your Honor, we feel like his

21  conditions and his treatment combined with his age, weight

22  problems, and everything that he's dealing with, including the

23  lung problem, the pulmonary problem, and heart problem,

24  combined to take this situation outside the standard case and

25  to make it exceptional and one for which the court could

1    consider a downward departure.

2         THE COURT:  But now you are aware that the Bureau of

3    Prisons has institutions that have attached hospitals.

4         MR. HOLLOMON:  Yes, Your Honor, absolutely.

5         THE COURT:  So then --

6         MR. HOLLOMON:  That would be at the expense of the

7    federal government as opposed to my client being responsible

8    for his own health care himself and his insurance paying -- or

9    Medicare paying for that health care.

10        THE COURT:  And I don't believe you can point to any

11   case citation which says that this health matter under these

12   circumstances would be a basis for a downward departure.

13        MR. HOLLOMON:  Your Honor, the only case I would cite

14   to the court is a case that was here in the Southern District

15   of Mississippi before Judge Jordan in which a client of mine

16   who was somewhat older than Mr. Benjamin, the client's name was

17   Bill Gordon, had a number of chronic health issues very similar

18   to what Mr. Benjamin has and the judge in that case saw fit to

19   grant a downward departure.  I think it was one level, Your

20   Honor, because of the chronic health issue my client was

21   suffering.  It was very similar factually analogous to this

22   case with Mr. Benjamin.

23        THE COURT:  All right.  But do you have any other

24   authorities on it?

25        MR. HOLLOMON:  No, Your Honor.

1    THE COURT:  Okay.  And I don't know all the

2    circumstances of that particular case.

3        MR. HOLLOMON:  Yes, sir.

4        THE COURT:  Because this case is not in front me.

5        MR. HOLLOMON:  Right.

6        THE COURT:  Maybe I would have done the same thing.  I

7    do not know.  Or maybe I would not have.  But I can only say

8    that that case and its facts are not before me at present.

9        MR. HOLLOMON:  We understand, Your Honor.

10       THE COURT:  I do not have a grasp of what the facts

11   were in that particular case.  Now, then, you also submitted to

12   the court that your client has had a long history of public

13   service.  And do you have any cases which state that that is a

14   matter that should be the basis for a downward departure?

15       MR. HOLLOMON:  I don't have the case law, Your Honor,

16   that says that specifically.  But we feel like that is a factor

17   under 3553 for the court to consider in conjunction with the

18   possibility of a downward departure because of age and health.

19       THE COURT:  Well, I agree it's a point that the court

20   could consider.  But the court may, on the other hand,

21   determine that that factor should be considered within the

22   guideline range but not as a downward departure matter because

23   it would not be outside the heartland of the factors that were

24   taken into account when the guideline range was construed by

25   the sentencing commission.

1          MR. HOLLOMON:  I agree with the court, Your Honor.

2          THE COURT:  So then I would certainly take it into

3    account in determining where he should fall within the

4    guideline range.  Now, was there a third consideration?

5          MR. HOLLOMON:  No, Your Honor.

6          THE COURT:  Those were the only two?

7          MR. HOLLOMON:  Those are the only two, Your Honor.

8          THE COURT:  Okay.  Thank you.

9          MR. HOLLOMON:  Thank you, Your Honor.

10          THE COURT:  Let me turn to the prosecution.  I've

11    discussed this with Mr. Hollomon, but do you have anything you

12    would like to add to this matter concerning a downward

13    departure?

14          MR. LaMARCA:  Your Honor, the government stands by its

15    recommendation in the plea supplement, which is the lower 25

16    percent of the guideline range.

17          THE COURT:  Now, the government had no objection to

18    this defendant being awarded an extra point for acceptance of

19    responsibility.  Is that correct?

20          MR. LaMARCA:  That's true.

21          THE COURT:  Ordinarily a defendant gets either one

22    point, two points, three points.  But in the plea agreement

23    that you have with the defendant, the government agreed to

24    recommend an additional one level for acceptance of

25    responsibility to make the total three points instead of two

1   points if the guideline points reached the level of 16 or

2   above.

3        MR. LaMARCA:  Yes, Your Honor.

4        THE COURT:  So then since this level is above 16 and

5   the probation officer then gave the extra point, that's

6   pursuant to your plea agreement.  Is that correct?

7        MR. LaMARCA:  Not only pursuant to the plea agreement,

8   but also pursuant to the guidelines themselves, Your Honor.  He

9   did qualify under the guidelines for that additional point.

10       THE COURT:  Okay.  And with regard to the government's

11  position as to the guideline range, are you asking this court

12  to upward depart or downward depart?

13       MR. LaMARCA:  Your Honor, we're asking the court to

14  sentence the defendant pursuant to our plea agreement to the

15  lower 25 percent of the guideline range.

16       THE COURT:  So then by that recommendation you are

17  saying that you are not asking the court to consider sentencing

18  him under the statute?

19       MR. LaMARCA:  No, sir.  That is correct.

20       THE COURT:  You're asking the court to sentence him

21  under the guideline range without any imposition of an upward

22  departure?

23       MR. LaMARCA:  Your Honor, that is correct.  We make

24  the recommendation of the lower 25 percent of that range.

25       THE COURT:  All right.  Thank you very much.  Now,

1  Mr. Hollomon, you and your client approach the podium, please.

2          MR. HOLLOMON:  Yes, Your Honor.

3          THE COURT:  Now, Mr. Hollomon, I'll allow you to state

4  your understanding of the guideline range at this point, and

5  then I will turn to the prosecution and to the probation

6  officer to see if they agree with your understanding as -- with

7  what has been set out already as the guideline range.

8          Thank you, Your Honor.  My understanding, Your Honor,

9  is the guideline range is based on an adjusted offense level of

10  27 and a criminal history category of 1 and that range would be

11  70 to 84 months.

12          THE COURT:  Are you saying 84?

13          MR. HOLLOMON:  70 to 84 months, I believe, Your Honor.

14          THE COURT:  I want you to look at that again.

15          MR. HOLLOMON:  I'm sorry, Your Honor.  It's 87.

16          THE COURT:  Okay.  70 to 87 months.

17          MR. HOLLOMON:  Yes, Your Honor.

18          THE COURT:  All right.  Continue.

19          MR. HOLLOMON:  The lower 25 percent, Your Honor, I

20  believe would be 70 to 74.

21          THE COURT:  Okay.  Continue.  Supervised release?

22          MR. HOLLOMON:  Bear with me, Your Honor.  A term of

23  supervised release, Your Honor, of not more than three years,

24  and the guideline provision would be for a class C felony 1 to

25  3 years under 5D1.2(a)(2).

1        THE COURT:  Okay.  And the fine range?

2        MR. HOLLOMON:  The fine range, Your Honor, is from

3   12,500 to $125,000.

4        THE COURT:  Restitution is not applicable?

5        MR. HOLLOMON:  No, Your Honor.

6        THE COURT:  And then special assessment is $100 to

7   Count 2.

8        MR. HOLLOMON:  Yes, sir.

9        THE COURT:  Let me turn to the prosecution.  I wanted

10  Mr. Hollomon to tell the court his idea of the guideline range,

11  and he has done so so I could be sure that the defendant has

12  been advised as the court has calculated the guidelines.  Do

13  you agree with what Mr. Hollomon had to say?

14        MR. LaMARCA:  I do, Your Honor.

15        THE COURT:  Okay.  Thank you.

16        MR. LaMARCA:  And there is the additional issue of

17  forfeiture.

18        THE COURT:  Okay.  Tell me about forfeiture.

19        MR. LaMARCA:  Your Honor, the plea agreement contains

20  a provision that a money judgment would be entered in the

21  amount of $260,782 which represents the net benefit of the AD&D

22  program for the three counties involved.  I'm sorry.  The two

23  counties, Alcorn and Simpson County, back in 2012.

24        THE COURT:  Mr. Hollomon, what have you to say about

25  this forfeiture?

1          MR. HOLLOMON:  Judge, that is contained within the

2    plea agreement we signed.

3        (Defendant and Counsel Conferred)

4          THE COURT:  Mr. Hollomon, you have something to add on

5    that?

6          MR. HOLLOMON:  No, Your Honor.  I just wanted

7    clarification.  Thank you.

8          THE COURT:  Okay.  And, Mr. LaMarca, you agree that

9    probation is not a factor here?

10          MR. LaMARCA:  I do, Your Honor.

11          THE COURT:  Okay.  Let me turn to my probation

12    officer.  Do you agree on these calculations?

13          PROBATION OFFICER:  Yes, sir, I do.

14          THE COURT:  Are there any points you'd like to add?

15          PROBATION OFFICER:  No, Your Honor.

16          THE COURT:  All right.  Thank you.  So then now I will

17    hear from the defendant if he wishes to make allocution.  If he

18    is satisfied with his attorney making allocution, then I'll

19    hear from the attorney.  Both can make allocution or neither

20    can make allocution.  So, Mr. Hollomon, how would you like to

21    proceed?

22          MR. HOLLOMON:  Your Honor, my client would like to

23    address the court first, and I would like to address the court

24    briefly.

25          THE COURT:  All right.  Mr. Benjamin, go ahead.

1          MR. HOLLOMON:  Your Honor, I find myself in a very

2    humiliating and embarrassing situation at the age of 70, the

3    final years of my life.  I'm so sorry that I've destroyed all

4    of the history and character that my family stood for.  If you

5    read the criminal records of my family, you will find that it's

6    nonexistent.

7          I have no one to blame for this deal but myself.  I'm

8    so sorry.  I made a mistake, and I'm here to take

9    responsibility for it and express that to you, the court, and

10   move on.  I'm sorry that -- I apologize to anyone that I have

11   offended in the process.  And I regret it every day of my life.

12   So I'm truly sorry for what's happened.  And thank you, Your

13   Honor.

14         THE COURT:  Mr. Benjamin, there was a letter submitted

15   by one of your supporters -- more than one that was submitted

16   by your supporters that says that the writer could not

17   understand how you had been involved in this unless there had

18   been some pressure against you by other wrongdoers in this

19   matter.

20         At time you entered your plea of guilty, I discussed

21   some of these things with you.  In fact, at the time you

22   entered your plea of guilty, I asked you about a comment or two

23   that I saw with regard to some statements attributed to Mr.

24   Epps.  In the presentence investigation report here, I see

25   again some of those statements of matters where allegedly

1   Mr. Epps told you that you had to go along with these deals;

2   otherwise, he would shut down the program, especially where

3   your assistance in constructing a facility needed 300 bodies at

4   that facility and Mr. Epps controlled the number of persons who

5   could eventually be sent to that facility and that you

6   allegedly had a conversation with him where he made some

7   financial threats.  Would you tell me about that?

8        THE DEFENDANT:  Yes, sir, Your Honor.  I've been

9   operating in the jail business since 1996 or -7.  I never

10  encountered any problem.  We built facilities at Chickasaw

11  County, we built facilities at Marion County and worked with

12  other facilities at Holmes and Jefferson.

13       When we got into the construction on the Alcorn,

14  Chickasaw, and Washington county facilities and we were about

15  completed with them and getting ready to start to populate

16  them, then the commissioner Epps came in and demanded money.  I

17  kind of laughed him off to start with.  I said, *You've got to*

18  *be kidding me.*

19       He said, *You can't run them without inmates.  You just*

20  *bogged down.*

21       You had to put in under the contracts with the

22  contract -- all of my contracts were with the counties.  I

23  didn't have a contract with Department of Corrections.  But

24  they had to supply 80 percent inmates pay to the county in that

25  facilities once it's up and going.  But in order to profit and

1    cash flow and do that, you had to go up to what the maximum was

2    becuase you had to pay the debt service on that extra

3    20 percent because you built the buildings for.

4         I found myself that I either had to walk away and

5    leave those counties to start up and go to operating something

6    that they didn't have a clue about or cooperate with Epps so he

7    would get the inmates and then I could hold true to my

8    contract.  I was too committed.  I wanted to make those county

9    projects be very successful.

10        We had worked for years on some of them.  I started in

11   '96 with Chickasaw County.  We never came to fruition until

12   2007.  So they were long-term projects.  Alcorn I started with

13   them in 2004.  We worked with them all the time and we finally

14   got it into fruition.

15        So he made the demands of, *You can't run them.  If I*

16   *don't get money, you ain't going to get no inmates.  You can't*

17   *run them without inmates*.  So that's how it started.  And I

18   made the wrong decision.  I should have just walked away.

19   That's easy for me to say walk away, but when you're out there

20   in a position I was in, I was born and raised -- these boards

21   of supervisors had committed to these multi-million dollar

22   contracts to build these facilities anticipating I was going to

23   be there to help them go through their construction phase,

24   through the startup, and help them get accredited through the

25   process to meet the accreditation.

1       All of the sudden, that burden of responsibility is

2   heavy.  It's real heavy on you.  And I thought it was through

3   with the deal once I heeded to his demand, then I thought we

4   were in good stead and everything was going fine.

5       In the presentencing report -- when we were on the

6   presentencing, you asked me if there was anyone available in

7   the office whenever the demands were made, and there were not.

8   And in the presentencing report, I submitted a response to a

9   question pertaining -- that that wasn't -- I wasn't the only

10  one who got hammered with the demand for money or no inmates.

11          THE COURT:  Now, rest assured I read your letter.

12          THE DEFENDANT:  All right.

13          THE COURT:  You submitted that subsequently, and I

14  read it, but I'm going to let you go ahead and state it on the

15  record here.  But I was letting you know that I did read it.

16          THE DEFENDANT:  Yes, sir, thank you.

17          THE COURT:  And you describe in detail what you

18  consider to be your response to the question I asked you at

19  sentencing whether at the time any demands of money were made

20  upon you whether anybody else was present.  And you answered at

21  that time there was nobody present.  You then submitted a

22  letter subsequent where you wanted to correct that.  I have

23  read that.  So go ahead and make your public statement.

24          THE DEFENDANT:  There was no one present.  But as we

25  were in the final stage of the construction in getting ready to

1    start populating the facilities, the first one was the

2    Chickasaw County Jail because we did a regional jail.  They had

3    built a new county jail.  I went to -- I went to all these

4    construction sites on a regular basis every week to make --

5    look for problems, to make sure everything was kosher and

6    address any problems that they may have.

7             On a trip up to Chickasaw County, the warden who I

8    quoted his name, Rand Huffman, called me in his office and

9    said, *Can you talk to Commissioner Epps?*

10            I said, *Well, I can talk to him.  I don't know whether*

11   *he will listen to me or not, but what do you need?*

12            He said*, Well, the county has been informed if we*

13   *don't sign a telephone contract with the Sam Waggoner Group, we*

14   *ain't going to get no inmates.*

15            I said, *Well.*

16            He said, *The problem is we've had our telephones*

17   *carried by a company out of Alabama represented by a man by the*

18   *name of Graham Hopkins.*  And he says, *The county has already*

19   *signed the contract with him.  They've already -- the company*

20   *has paid the county $25,000, and they've already used the*

21   *money, I think.*

22            I said, *I don't know.  I can certainly try to talk to*

23   *him.*

24            So I came on like Wednesday that week, and Thursday I

25   went to see Commissioner Epps.  And I said, *Now, people in --*

1    *the people in Chickasaw County are all upset at you, mad at*

2    *you.*

3         He said, *Well, what about?*

4         I said, *All this deal about the telephones.*

5         *Well, they can get mad if they want to, whatever.*

6         I said, *Well, they've already signed a contract with*

7    *this company out of Alabama that had the telephone service in*

8    *the county jail before they ever built the regional, and they*

9    *wanted to continue that contract.*

10        He said, *Well, they ain't going to do it in my system.*

11   *They ain't going to get -- they ain't going to get inmates*

12   *unless they sign a contract with the Sam Waggoner Company.*  He

13   said, *You can tell them --* and he stopped and said, *No, better*

14   *than that, I'll tell them.*

15        I said, *That's fine, Commissioner.  You need to tell*

16   *them because I'm not in the phone business.  I don't want them*

17   *mad at me.  They are already upset so you tell them.*

18        Well, I left the office, and then I went to Chickasaw

19   County on the following Monday for the board meeting, and I

20   often made board meetings.  As I walked in, the sheriff was

21   there, and, boy, the sheriff was hot.

22        And he called me and he said, *I tell you one thing,*

23   *Epps can get in trouble doing what he's doing with the*

24   *telephones.*

25        I said, *Well, I know.  And I told him that, but I*

1   *can't do nothing with him.  I've talked to him.*

2          So that was all that was said.  The next thing I was

3   informed later on they went back and they canceled the contract

4   with the Graham Hopkins Group of Alabama and gave the contract

5   all to the Sam Waggoner group in Chickasaw County and they had

6   the jails.  And it was all over the battle for the inmates.

7   That was the key to it, and that was the wedge that he started

8   out with, and that was the wedge that I got hammered with all

9   over.

10          Every place that I worked in regional jails were

11   subject to the population fluctuation.  It moved all the time.

12   All you had to do to penalize everybody is drop them.  And the

13   thing that made it hard for me to just walk away is you look at

14   the ACA test scores from the counties that I worked for.

15          Those audits come every three years, and every year I

16   was three years away from two or three audits, two years away

17   from two or three audits and we had two or three audits going

18   on that particular year.  And it was hard to break off away

19   from those counties and just dump them and leave them.

20          That was the driving factor that kept me making bad

21   decisions, but I had competition in the marketplace that did

22   ACA stuff.  They charged almost twice as much per month to do

23   the same stuff that I did and so it was just a pressure

24   situation.  It was just a bad deal.  I should have not given

25   any concern whatsoever to the counties, I guess.  But I wanted

1    them to be successful, and I worked at it.

2            The funds that Epps got from me were dollars that I

3    earned, honest working hard, providing the services from every

4    contract.  Nobody suffered.  Nobody's fees changed as a result.

5    Those dollars I drew down personally out of the company, and I

6    paid him cash money, and I recorded and paid income taxes on

7    this income.  And I took the hit.  The counties didn't suffer.

8    None of the businesses I worked with suffered.  I took the

9    loss.

10           And I performed for every county.  You can go to any

11   county that I worked for.  You can look at the test scores from

12   the audits.  The drug and alcohol program was the one I ran for

13   the Department of Corrections.  I made sure to do the very best

14   drug and alcohol program that the state ever had, and it was by

15   far better.  It's better than anything they've got right now

16   because my focus was to make the inmates' life better.  We

17   did -- not just these books here for you.  We did them.  We

18   just picked those up and brought them for you.

19           But we did them on graduating classes because we

20   wanted to make the drug and alcohol program an experience in

21   life.  A lot these inmates had never graduated from anything.

22   They never had achieved anything.  So we wanted to make a

23   lasting impression on them as we did the drug programs.  We

24   brought in Fred Guenther who runs the residential therapeutic

25   center in Greenwood, one the better ones in the country and one

1    of the best.  We went after the very best people to help us

2    make sure that those inmates got the very best experience in

3    the drug and alcohol program they could get.

4         I won't back up to nobody to the program we ran.

5    There's a lot of ways to cut corners in drug and alcohol.  Our

6    goal was to have 25 hours a week for those inmates, 12 to 15

7    hours in classroom, another three to six hours in group

8    sessions and individual sessions.  We bought at our expense

9    individual manuals, and she has them listed in that letter that

10   cost 35, $40 for the package for the course of the classes.

11   And there are workbooks that they could go in and work, and we

12   used the higher academic achieving inmates to help the more

13   illiterate ones work through the graphics and the workbooks,

14   and they are built on a third-grade level.  And this particular

15   program was designed by the Chance Company at the demand of the

16   U.S. Department of Justice to create a residence therapeutic

17   program that would move into the prison setting.  That's what

18   it was designed for.

19        Now, very few people -- I don't know few people

20   anywhere that buy these programs because they are expensive.

21   And that's the reason why you won't ever have in program in the

22   Department of Corrections because it requires complicated staff

23   working, and it requires a lot of money.  And every time you

24   cut funding for corrections, you're reducing the number of

25   guards, you reduce the programs because you've still got to

1    feed them, to keep the lights on.

2         So it sounds great that we're going to cut all this

3    money for corrections, but then we're going do recidivism?

4    That's not going to happen because recidivism is expensive and

5    it takes a lot of money.  And most recidivism programs that

6    I've reviewed or worked on or saw are way underfunded.  So we

7    try to make it a meaningful experience.

8         My sole objective was regardless of what my deal --

9    relationship with Epps was, as unpleasant as it was, I was

10   committed not to let one inmate or one program suffer as a

11   result of that bad relationship, and I did not.  And for that

12   I'm truly honored.

13        THE COURT:  All right.  Mr. Hollomon.

14        MR. HOLLOMON:  Your Honor, I would state to the court

15   I think anyone would concede that Irb Benjamin lived an

16   exemplary life up until 2011 when he ran into Chris Epps.  He

17   had been in the corrections business for some period of time

18   and had worked at least three other corrections commissioners

19   without bribes or without this kind of shakedown.  And he

20   performed honorably and he developed a good reputation with

21   corrections and for corrections in the state of Mississippi and

22   among the counties.

23        He grew up one of 13 children.  His dad sharecropped.

24   He grew up.  Made his first crop when he was 13 years of age.

25   He could calculate how much fertilizer was needed for the

1    ground to fertilize, how much seed to plant.  And he grew up

2    hard, working hard.  And accomplishment meant something.

3    Education meant something to Irb and his family.

4         And he later served in the state house of

5    representatives for a term and later in the state senate and

6    accomplished, I submit, a lot of good.  And Irb doesn't want me

7    to -- Irb is a very humble person, Your Honor.  What's in those

8    letters is true.  That's the person I know.  He does not like

9    to blow his own horn.  But while he was in the legislature, in

10   the senate he was one of the original legislative planners for

11   the 1987 highway program which created over 1,000 miles of

12   four-lane highways all over the state.  He was instrumental in

13   placing all public school teachers in a statewide health

14   insurance plan when he chaired the state education committee.

15        While chairman of that committee, he was successful in

16   passing the first equity funding package for public education

17   funding, and this ensured parity funding in all Mississippi

18   school districts.  While he was a member of the house of

19   representatives insurance committee, he was instrumental in the

20   passage of legislation which required insurance companies to

21   offer uninsured motorist coverage on automobile insurance

22   policies sold to the citizens of the state of Mississippi.  And

23   he was instrumental in creating a special revolving loan fund

24   to help fund the new agricultural ventures in the state of

25   Mississippi, and this legislation opened the door for the

1  poultry industry in Mississippi to thrive and flourish, which

2  it's doing today.

3          So he, Judge, I think led a life to be proud and a

4  life of accomplishment.  He raised an extended family.  He's a

5  God-fearing man.  He's a Christian and religious man who relies

6  deeply on his faith.  And without reservation, Your Honor, I

7  submit to the court he is a good man.  I think he did something

8  here that was wrong.  He's admitted to that, and he's suffered

9  for it greatly.

10          It's painful when Irb comes to my office because he

11  always, always talks for a period of time about how much he

12  regrets what's happened and what he's done.  I know his words

13  to this court a few minutes ago were sincere and genuine.  I

14  know the pain he's experienced because of this.  And for all

15  those reasons, Your Honor, I ask the court to have leniency on

16  him and to fashion a sentence which takes into consideration

17  those factors that deserve credit and for which he's lived his

18  life.  Thank you, Your Honor.

19          THE COURT:  All right.  Thank you.  Now, why don't

20  y'all have a seat for a moment because I want to ask the

21  prosecution some questions.  Mr. LaMarca, did this defendant

22  cooperate with the prosecution?

23          MR. LaMARCA:  Yes, Your Honor.

24          THE COURT:  And did he do so from the first?

25          MR. LaMARCA:  Yes, Your Honor.

1    THE COURT:  And during your prosecution of him, did

2  you run into any difficulties whereby he may have been

3  stonewalling the investigation?

4    MR. LaMARCA:  No, Your Honor.

5    THE COURT:  And when he was confronted, was he totally

6  honest and informative about his criminal dealings?

7    MR. LaMARCA:  Initially like with most, the very first

8  instance was a minimization of it, but then after being

9  confronted all during the same meeting, he did fulfill his duty

10  of cooperating at that very same meeting.

11    THE COURT:  Did any information he furnished lead to

12  the prosecution or investigation of any others?

13    MR. LaMARCA:  Yes, Your Honor.

14    THE COURT:  And did those investigations culminate in

15  an indictment?

16    MR. LaMARCA:  They did.

17    THE COURT:  Is the government saying that the

18  information that he provided may be the subject of some

19  additional prosecution?

20    MR. LaMARCA:  Yes, Your Honor.

21    THE COURT:  Has the government made any arrangement or

22  deal with this defendant to submit a later request for

23  reduction in case he provides additional information or if he's

24  required to testify?

25    MR. LaMARCA:  Your Honor, we have broached that

1   subject with the defense.  Of course, we've made no promises

2   but we've intimated to the defense that that is a likely

3   scenario.

4            THE COURT:  So then if he cooperates further -- excuse

5   me.  Does he have to cooperate further to obtain this

6   recommendation from the government?

7            MR. LaMARCA:  Yes, sir, he does.

8            THE COURT:  And I'm not trying to get into any of the

9   depths of this matter, but would that cooperation mean possible

10  testimony or will you still have to debrief him further on

11  matters concerning these other situations?

12           MR. LaMARCA:  Testimony.

13           THE COURT:  Testimony.  And at present, there have not

14  been indictments on those particular persons?

15           MR. LaMARCA:  That is correct.

16           THE COURT:  And do you have a timetable as to when you

17  might expect further indictments to be returned, if they are to

18  be returned?

19           MR. LaMARCA:  I would have liked to have seen them two

20  months ago.  I would say these are matters that are handled in

21  the Southern District of Mississippi, likely on or Gulf Coast

22  office and would -- it would be hard to say without speaking to

23  the responsible AUSA for that matter, Your Honor.

24           THE COURT:  Okay.  I don't need you to do that.  I'm

25  just trying to get some time frames.  So at present you are

1    uncertain as to how far in the future these matters will be

2    resolved, that is, whether there will be extra indictments,

3    whether those indictments will need the testimony of this

4    defendant and whether the prosecution thereafter will be in a

5    position to make a recommendation for a reduction of sentence.

6         MR. HOLLOMON:  Correct, Your Honor.  I think it's just

7    a matter of time.

8         THE COURT:  Okay.  Now, with regard to the defendants

9    who have already pleaded guilty, and those who have been

10   sentenced by this court, did this defendant provide any

11   assistance with regard to their circumstances?

12        MR. LaMARCA:  Of course, with regard to Mr. Epps who

13   has yet to be sentenced, he has provided additional information

14   that would or has benefited the government with regard to

15   Mr. Epps.  The information with regard to holding inmates that

16   the court just elicited just a minute ago is a matter that will

17   impact we believe Mr. Epps' sentencing.  I need to confer with

18   the agent one second to answer any further --

19        THE COURT:  All right.  Go ahead.

20     (Short Pause)

21        MR. LaMARCA:  Your Honor, Mr. Benjamin through

22   independent meetings with agents and the government

23   corroborated the -- what the court has heard with regard to

24   Mr. Waggoner -- what the court has heard with regard to the

25   general way that kickbacks were played to Mr. Epps.  The

1    individuals that the court has sentenced to this point as the

2    court's aware have also provided the same -- the information

3    that gave the government the scheme that was perpetrated here

4    by Mr. Epps and his coconspirators.

5              THE COURT:  So then other than Mr. Epps whom the court

6    has yet to sentence, and with regard to all of the other

7    defendants who have pleaded guilty and have been sentenced or

8    are awaiting sentence, then this is all that he has contributed

9    with regard to those defendants?

10             MR. LaMARCA:  That's true, Your Honor.

11             THE COURT:  And the government has said they made a

12   recommendation to the lower 25 percent.

13             MR. LaMARCA:  Yes, sir.

14             THE COURT:  Do oppose the motion for reduction?

15             MR. LaMARCA:  Your Honor, we will stand by our

16   recommendation.  We will with regard to any reduction or

17   variance leave that to the discretion of the court.  We are

18   going to abide by our recommendation contained within the plea

19   supplement.

20             THE COURT:  All right.  Thank you very much.

21             MR. LaMARCA:  Yes, sir.

22             THE COURT:  Will the defendant and counsel approach

23   the podium.  I'm now ready to sentence the defendant.  I've

24   considered the advisory guidelines computations and the

25   sentencing factors under 18 USC Section 3553(a).  The court has

1    determined to sentence the defendant under the guidelines, not

2    under the statute, which the court has discretion to do.   The

3    court moves to the statute when the court feels sometimes that

4    a sentence in the higher end is more appropriate.   At other

5    times, the court has moved to the statute when it feels that a

6    sentence under the statute is appropriate because the defendant

7    is entitled to greater consideration for some special factor.

8         I have looked through the presentence investigation

9    report and I do not see, Mr. Benjamin, a special factor.   The

10   guidelines take into account age, the guidelines take into

11   account health, and the guidelines take into account with

12   regard to a downward departure what a person has accumulated by

13   way of good guy references and accomplishments.   But the court

14   can consider that the in the guideline range itself.

15        So the guideline range here has been reported, all

16   agree here, and I have considered all of the contributions

17   you've made before you found yourself in this circumstance.   I

18   see the many respected jobs that you worked.   I see the many

19   lives that you have touched by what you have done in the past.

20   I see how you have been a family man throughout this ordeal and

21   the court is impressed with all that up until the court gets to

22   this particular matter.

23        So the court then has this guideline range to look at,

24   and the court doesn't see at this juncture where the court can

25   downward depart because you only base your downward departure

1    motion on your age and on your health.  Both those have been

2    considered in the formation of the guideline computations.  So

3    I didn't have anything else for a downward departure or

4    variance.

5         But the government tells me that you have been

6    cooperative, and the court recognizes that that's a matter that

7    could come back before the court.  But right now the court has

8    to sentence you under what the presentence investigation report

9    contains and what has been submitted by you and your attorney.

10        So as I stated, I will take into account all the good

11   things that you have done.  And because of that, then I feel

12   you ought to be at the low end of the guidelines.  That will

13   put you at 70 months imprisonment as to Count 2, which is the

14   lowest of the guidelines that you will be in the United States

15   Bureau of Prisons' custody and then pay a fine of $100,000 and

16   be on two years supervised release subject to the standard and

17   mandatory conditions as listed on the judgment order in

18   addition to the following special conditions, that is, that you

19   should not incur new credit charges or open additional lines of

20   credit without the approval of the probation officer until such

21   time as the fine is paid in full.  You shall provide the

22   probation office with access to any requested financial

23   information, and you have to pay the special assessment fee of

24   $100.

25        Now, in imposing this sentence, the court recognizes

1    that still to come possibly is the government's recommendation

2    that you receive some credit for your assistance and the court,

3    if such a motion is filed, then the court will look at that

4    motion and determine at that time how the court should approach

5    that motion and adjust this system -- this sentence.

6              So the prosecution tells me that that matter might not

7    come up for a period of months.  But when it comes up and if

8    you have satisfied the prosecution of your contribution, then

9    the pros -- the prosecution will make a motion to the court and

10   I will study that motion and determine then whether I should

11   reduce your sentence based on that cooperation.  Do you

12   understand that?

13             THE DEFENDANT:  Yes, sir, Your Honor.

14             THE COURT:  Now, you have to pay the special

15   assessment fee of $100, what I've stated already.  So then do

16   you under what the sentence is?

17             THE DEFENDANT:  Yes, sir.  70 months.

18             THE COURT:  Seventy months and two years supervised

19   release, a fine of $100,000.

20             Now, I have looked at your financial records and you

21   are capable of paying that amount of money because I've looked

22   at what your net worth is.  So the government recommended

23   25 percent in the lower category.  I followed that

24   recommendation and sentenced you in the lower 25 percent.  But

25   in addition, I've sentenced you at the very lowest months of

1   the presentence investigation report.  Do you understand that?

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  I told you I'd be waiting to see what the

4   government has to say with regard to your cooperation in these

5   other matters that the government says that it is looking to to

6   see what your support will be on those matters.  And if the

7   government files the motion, then asking that the court

8   consider either downward departure or variance, the court will

9   consider that and make a determination then.  Do you understand

10  that?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  Now, Mr. Hollomon, do you have any

13  questions about the sentence?

14          MR. HOLLOMON:  No, Your Honor.

15          THE COURT:  Let me turn back to the prosecution.  Mr.

16  LaMarca, in view of this other circumstance, are you asking

17  that this defendant be incarcerated any time soon, or do you

18  want him still available to assist the prosecution?

19          MR. LaMARCA:  Your Honor, we would not object to him

20  self-reporting.  At the time he is needed, we will make

21  arrangements to have him here if necessary.  And we do have a

22  couple of other matters I'd like to bring to the court's

23  attention as well.

24          THE COURT:  You mentioned this matter of forfeiture,

25  didn't you?

1          MR. LaMARCA:  I did.

2          THE COURT:  Why don't you discuss it now.

3          MR. LaMARCA:  Thank you, Your Honor.  We have an

4   agreed preliminary order of forfeiture that I am would like to

5   present to the court.

6          THE COURT:  Okay.

7      (Document Tendered to the Court)

8          THE COURT:  I have this agreed preliminary order of

9   forfeiture.  It is in two pages.  On the signature line it's

10   signed by Mr. Darren LaMarca.  Then on the defendant line it's

11   signed by the defendant, Mr. Irb Benjamin.  And then Mr. Joe

12   Hollomon signed as the attorney for the defendant.  I need to

13   address the defendant.  Mr. Benjamin, did you sign this?

14          THE DEFENDANT:  Yes, sir, Your Honor, I did.

15          THE COURT:  And before you signed it, did you read it?

16          THE DEFENDANT:  I read the total.  I didn't read the

17   whole thing.

18          THE COURT:  You want to read the whole thing?

19          THE DEFENDANT:  No, sir.  I'm fine.

20          THE COURT:  No, I need you to the read it so that the

21   record will reflect that you read it.  Mr. Hollomon, why don't

22   you come get it and give your client an opportunity to read the

23   whole thing.

24          MR. HOLLOMON:  Yes, Your Honor.

25          THE COURT:  You all can sit down and read it.

1          THE DEFENDANT:  Yes, sir, please.

2      (Short Pause)

3          THE DEFENDANT:  I have completed reading it, Your

4  Honor.  I have completed the reading of the agreement.

5          THE COURT:  All right.  What about May 16th,

6  Mr. Hollomon, for your client to voluntarily report?

7          MR. HOLLOMON:  May 16th, Your Honor?

8          THE COURT:  2017.

9          MR. HOLLOMON:  Yes, sir.

10          THE COURT:  At 9:00.

11          MR. HOLLOMON:  Yes, sir.

12          THE COURT:  Mr. Benjamin, do you understand that?

13          THE DEFENDANT:  Reporting date?

14          THE COURT:  Yes, May 16.

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  9:00 a.m.  At the designated facility.

17  Probation?

18          PROBATION OFFICER:  Yes, Your Honor, just briefly.

19  With regard to the fine, it is probation's recommendation that

20  the interest requirement be waived and also given the

21  defendant's financial condition that the fine be paid in full

22  within 180 days from today's date.

23          THE COURT:  Mr. LaMarca?

24          MR. LaMARCA:  Your Honor, we would ask that the fine

25  and forfeiture be paid by a certain date, and we ask that that

1    date be prior to May 16th.

2         THE COURT:  The agreed preliminary order of forfeiture

3    that the parties have submitted says that the defendant agrees

4    to a money judgment of $260,782.  And as I stated before, the

5    parties have agreed to this.  Now, Mr. LaMarca, you're asking

6    that this amount be paid when?

7         MR. LaMARCA:  Prior to the date that he should report.

8         THE COURT:  Mr. Hollomon, your response?

9         MR. HOLLOMON:  Your Honor, we would ask the court to

10   allow the additional time as requested by probation to give us

11   180 days to get that paid.

12        THE COURT:  And is there any reason why you need the

13   whole 180 days?

14        MR. HOLLOMON:  Judge, that is a substantial sum of

15   money, including the fine.  And know it's going to take my

16   client some management and time to get that worked out.

17        THE COURT:  I believe I saw some items in the

18   financial report which were matters that could be cashed out,

19   though.  Do you have that presentence investigation report in

20   front of you?

21        MR. HOLLOMON:  I do, Your Honor.  Your Honor, what my

22   client needs to do is he will have to liquidate some assets in

23   the market and that, of course, may take a little time.  It may

24   take -- I'm sure he'll comply with it as soon as possible.  But

25   we would like to have the additional time in the event it takes

1    that time to market these securities and assets.

2              THE COURT:  Okay.  Mr. Hollomon, I'm looking at page

3    24 of the presentence investigation report.

4              MR. HOLLOMON:  Yes, sir.

5              THE COURT:  And I'm looking at a personal savings

6    account of 118,000 plus.  I'm also looking at a personal saving

7    account of 8,000 plus.  I see an Edward Jones account of

8    224,000 plus.  And I see another --

9              MR. HOLLOMON:  Judge, I'm sorry.  I don't mean to

10   interrupt, Your Honor.  My client tells me that account is, in

11   fact, securities that would have to be marketed.

12             THE COURT:  Okay.  But the next one is too, individual

13   mutual funds --

14             MR. HOLLOMON:  Yes, sir.

15             THE COURT:  -- of 314,000 plus, almost 315,000.  And

16   then some master funds that have a total of 88,000 plus

17   because --

18             MR. HOLLOMON:  Those are securities also, Your Honor,

19   my client tells me.

20             THE COURT:  This presentence investigation report

21   shows that your client has a total asset base of a little more

22   than 1.5 million.

23             MR. HOLLOMON:  He and his wife, Your Honor.  And, of

24   course, some of those assets are fairly illiquid.

25             THE COURT:  Fairly what?

1              MR. HOLLOMON:  Illiquid.

2              THE COURT:  Okay.  Well, there's a house here, the

3     residence in which he lives, the vehicle.  There's some land in

4     Alcorn County and jewelry, et cetera.  So there's some other

5     matters here, right, that it would have to be appraised.  But

6     he wouldn't necessarily have to do that since his securities

7     should take care of these obligations here.  Now, but you're

8     asking for 180 days in order to sell these matters off.  That's

9     a long time to have to them sell off, 180 days.  Now, I

10    recognize you don't want to have to do it overnight and have

11    some sort of fire sale on those assets.

12             MR. HOLLOMON:  Yes, sir.

13             THE COURT:  But what about three months instead of six

14    months?

15             MR. HOLLOMON:  That's fine, Your Honor.  We'll -- if

16    the court will allow us that time, we'll work with that.

17             THE COURT:  All right.  I'll give you 90 days then --

18             MR. HOLLOMON:  Thank you, Your Honor.

19             THE COURT:  -- to satisfy these matters because, as I

20    said, I recognize that these securities have to be liquidated

21    and you want to try and get top dollar --

22             MR. HOLLOMON:  Yes, sir.

23             THE COURT:  -- for those.  And so I'll give you 90

24    days for both the restitution -- for the forfeiture, I mean,

25    and the fine.  Ninety days.

1          Now, Mr. Benjamin, I have given you the time you are

2     to report.  You understand if you do not report on that date

3     that you'll be in violation of some other criminal statute.

4          THE DEFENDANT:  Yes, sir, Your Honor.

5          THE COURT:  Are you telling me you're going to report

6     on the date that I provided to you?

7          THE DEFENDANT:  Yes, sir, I will report.

8          THE COURT:  And on this agreed preliminary order of

9     forfeiture that you signed, your lawyer signed, Mr. LaMarca

10    signed, I have now signed this third day of March, 2017, and

11    I'll have this filed.  So, Carmen, now to the prosecution, is

12    there anything further?

13         MR. LaMARCA:  Your Honor, the government moves to

14    dismiss the remaining counts of the indictment.  That would be

15    count 1 and 3, and we'll supply the court with an order.

16         THE COURT:  All right.  Thank you.  Mr. Hollomon, I

17    assume there's no objection?

18         MR. HOLLOMON:  No objection, your Honor.  And we would

19    move, Your Honor, to allow my client to self-report and to

20    remain free on the same bond until that time.

21         THE COURT:  He may do so unless the government

22    persuades me otherwise, Mr. LaMarca.

23         MR. LaMARCA:  No objection to that, Your Honor.

24         THE COURT:  That he be allowed to remain free until he

25    has to report.

1          MR. HOLLOMON:  Thank you, Your Honor.  We'd also ask

2    the court to recommend designation to the federal facility in

3    Montgomery, Alabama.

4          THE COURT:  All right.  And the basis?

5          MR. HOLLOMON:  Judge, that's just close to my client

6    and family and that was his desire.

7          THE COURT:  Mr. LaMarca?

8          MR. LaMARCA:  If he otherwise fits the classification,

9    no objection, Your Honor.

10          THE COURT:  Then I concur.  If he fits the

11    classification, then I make the recommendation.

12          MR. HOLLOMON:  Thank you.

13          THE COURT:  Anything further, Mr. Hollomon?

14          MR. HOLLOMON:  No, Your Honor.

15          THE COURT:  Mr. LaMarca?

16          MR. LaMARCA:  No, Your Honor.

17          THE COURT:  Ms. Harrell?

18          PROBATION OFFICER:  No, Your Honor.

19          THE COURT:  Good luck, Mr. Benjamin.  I probably will

20    see you again when they make a motion, should they make one.

21          THE DEFENDANT:  Thank you, Your Honor.

22          THE COURT:  You all can be excused.  Thank you.

23      (Hearing Concluded)

24

25

1                    CERTIFICATE OF REPORTER

2

3          I, CHERIE GALLASPY BOND, Official Court Reporter, United

4    States District Court, Southern District of Mississippi, do

5    hereby certify that the above and foregoing pages contain a

6    full, true and correct transcript of the proceedings had in the

7    aforenamed case at the time and place indicated, which

8    proceedings were recorded by me to the best of my skill and

9    ability.

10         I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13

14         This the 8th day of May, 2017.

15

16                         s/ *Cherie G. Bond*
                           Cherie G. Bond
17                         Court Reporter

18

19

20

21

22

23

24

25